Filed 8/5/20 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MICHAEL ABATTI, as Trustee, etc., et al.,<br><br>　　Plaintiffs and Appellants,<br><br>　　v.<br><br>IMPERIAL IRRIGATION DISTRICT,<br><br>　　Defendant and Appellant. | D072850<br><br>(Super. Ct. No. ECU07980)<br><br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on July 16, 2020, be modified as follows:

1.　　On page 26, footnote 15, the following sentences are to be added at the end:

In addition, Abatti stated in his combined brief that "the [District's] [f]armers have pre-1914 water rights," but explained in a petition for rehearing that he is asserting an interest in the District's water rights, not legal title to pre-1914 rights. We accept the clarification.

Accepting this clarification, we make the following further modifications:

On page 28, second paragraph, the sentence beginning with "And it is" is to end after "Imperial Valley."

On page 32, first paragraph, the first two sentences, starting with "Abatti raises" and ending with "the District" are to be deleted and replaced with:

> Abatti raises a related issue here. He contends that because the District's predecessor, the CDC, held water rights for private use, those rights remained private following establishment of the District.

On pages 33 and 34, the paragraph spanning these pages, starting with "Second, Abatti" and ending with "CDC," and footnote 22 therein are to be deleted, which will necessitate renumbering of all the subsequent footnotes.

On page 60, partial paragraph at the bottom of the page, the sentence starting with "He argues" and ending with "industrial use" is to be deleted and replaced with:

> He argues that farmers can assert injury because they are beneficial users of the District's water rights, and because the District's permit is subject to "vested rights"; Abatti maintains that, under its permit, the District would have "no power to transfer . . . water" other than for the original irrigation and domestic purposes and would have to comply with the no injury rule to add industrial use.

On page 61, first full paragraph, the sentence starting with "Abatti has not" and ending with "implicated" is to be deleted and replaced with:

> The key issue here is not whether the farmers are legal users; it is that there is no relevant injury since, as noted, there was no change to the point of diversion or place or purpose of use and thus, the no injury rule is not implicated.

2.      The opinion is also modified as follows:

On page 33, partial paragraph at the top of the page, the sentence starting with "The issue" and ending with "undisputed" shall be deleted and replaced with:

> The issue is not whether the District had to continue to provide some level of service upon acquiring its water rights; that appears to be undisputed.

2

On page 35, first full paragraph, the sentence starting with "In addition" and ending with "as well" is to be deleted and replaced with:

> In addition, present perfected rights are not based entirely on farming, but municipal and industrial use, as well, and farming was not the only historical use.

There is no change in judgment.

The petition for rehearing is denied.

BENKE, Acting P. J.

Copies to:  All parties

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MICHAEL ABATTI, as Trustee, etc., et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> IMPERIAL IRRIGATION DISTRICT, <br><br> Defendant and Appellant. | D072850 <br><br><br> (Super. Ct. No. ECU07980) |

APPEALS from a judgment and writ of mandate of the Superior Court of Imperial County, L. Brooks Anderholt, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Musick, Peeler & Garrett, Theodore A. Chester, Jr., Cheryl A. Orr; Caldarelli Hejmanowski Page & Leer, Lee E. Hejmanowski and Marisa Janine-Page for Plaintiffs and Appellants.

Sutherland & Gerber and Lowell F. Sutherland for Imperial County Farm Bureau, Imperial Valley Vegetable Growers Association, and Imperial Valley Water as Amici Curiae on behalf of Plaintiffs and Appellants.

Nossaman, Frederic A. Fudacz, Jennifer L. Meeker, Gina R. Nicholls and Tara E. Paul for Defendant and Appellant.

O'Laughlin & Paris, Tim O'Laughlin, Valerie C. Kincaid and Ryan E. Stager for San Joaquin Tributaries Authority as Amicus Curiae on behalf of Defendant and Appellant.

Allen Matkins Leck Gamble Mallory & Natsis and David L. Osias for Imperial Valley Coalition for the Fair Sharing of Water as Amicus Curiae on behalf of Defendant and Appellant.

Somach Simmons & Dunn, Andrew M. Hitchings and Alyson E. Ackerman for Association of California Water Agencies as Amicus Curiae on behalf of Defendant and Appellant.

Xavier Becerra, Attorney General, Robert W. Byrne, Assistant Attorney General, Tracy L. Winsor and Daniel M. Fuchs, Deputy Attorneys General, for State Water Resources Control Board as Amicus Curiae on behalf of Defendant and Appellant.

INTRODUCTION

The Imperial Irrigation District (District) supplies water from the Colorado River system to California's Imperial Valley. As an irrigation district, the District holds its water rights in trust for the benefit of its users, is responsible for managing the water

2

supply for irrigation and other beneficial uses, and is empowered by California law to do so. District water users include municipal, industrial, and agricultural users, or farmers.[1]

In 2013, the District implemented an equitable distribution plan with an annual water apportionment for each category of users (2013 EDP). Michael Abatti presently owns and farms land in the Imperial Valley. Abatti, as trustee of the Michael and Kerri Abatti Family Trust, and Mike Abatti Farms, LLC (collectively, Abatti) filed a petition for writ of mandate to invalidate the 2013 EDP on the grounds that, among other things, the farmers possess water rights that entitle them to receive water sufficient to meet their reasonable irrigation needs—and the plan unlawfully and inequitably takes away these rights. Abatti's position, fairly construed, is that farmers are entitled to receive the amounts of water that they have historically used to irrigate their crops.[2] The District contended that the farmers possess a right to water service, but not to specific amounts of water; that the District is required to distribute water equitably to all users, not just to

---

[1]    The terms "agricultural user," "agricultural water user," "landowner," and "farmer" appear throughout the record, briefing, and case law, sometimes interchangeably. In the interest of clarity, we generally use the term "farmer" to refer to irrigating landowners like Abatti, unless the context requires otherwise.

[2]    Abatti disavows that he is arguing that farmers are entitled to receive a particular quantity of water. But we see no other reasonable way to interpret his position, given that he appears to view any reduction in the amount of water available to farmers as a transfer of their rights to other users. We note that although Abatti's challenge to the 2013 EDP implicates farmers' rights and the treatment of farmers under the plan, and we therefore address farmers generally throughout the opinion, no other farmers are parties to this lawsuit and Abatti does not purport to be bringing a class or representative action.

farmers; and that the 2013 EDP allows the District to do so, while fulfilling the District's other obligations, such as conservation.

The superior court granted the petition. The court found that farmers "own the equitable and beneficial interest" in the District's water rights, which is appurtenant to their lands and "is a constitutionally protected property right." The court found that the District abused its discretion in prioritizing other users over farmers, taking water rights away from farmers and transferring those rights to other users, and failing to use historical apportionment to determine the quantities of water that farmers would receive under the plan. The court entered a declaratory judgment that prohibits the District from distributing water in the manner set forth in the 2013 EDP, and requires the District to use a historical method for any apportionment of water to farmers.

The District appeals from the judgment and writ of mandate. The District maintains that the farmers' interest is a right to water service, only, and contends that it did not abuse its discretion in setting the annual apportionment of water among its various categories of users or in adopting its agricultural allocation. The District further contends that the superior court erred by declaring that the District is required to distribute water to farmers based on historical use. Abatti cross-appeals from an earlier order sustaining the District's demurrer to his claims that the District's adoption of the 2013 EDP constitutes a breach of its fiduciary duty to farmers and a taking. The parties also raise procedural arguments.

We conclude that the farmers within the District possess an equitable and beneficial interest in the District's water rights, which is appurtenant to their lands, and

4

that this interest consists of a right to water service; the District retains discretion to modify service consistent with its duties to manage and distribute water equitably for all categories of users served by the District. Although the superior court acknowledged certain of these principles, its rulings reflect that it took an unduly narrow view of the District's purposes, thus failing to account for the District's broader obligations, and took an overly expansive view of the rights of farmers.

We further conclude that although the court correctly found that the District abused its discretion in the manner in which it prioritizes water users in the 2013 EDP, the court erred to the extent that it found any other abuse of discretion on the part of the District in its adoption of the 2013 EDP. The court also erred by granting declaratory relief that usurps the District's authority, and that is based in part on flawed findings. The court properly dismissed Abatti's breach of fiduciary duty and taking claims. Finally, we conclude that the parties' procedural arguments lack merit.

We emphasize that our conclusions are limited in scope. In order to resolve the issues raised by Abatti's challenge to the 2013 EDP, we must first determine the nature of the farmers' interest in the District's water rights. But we focus solely on the District, and take no position on other irrigation districts or the rights of their users. We analyze only the discretion exercised by the District in adopting the 2013 EDP, do not dictate the District's future exercise of that discretion—including as to any action taken in response to this opinion, and reject the superior court's attempt to do so. And we offer no opinion as to potential claims that a user might bring based upon such future actions by the District.

We affirm the judgment and writ of mandate as to the superior court's ruling that the District abused its discretion in how it prioritizes apportionment among categories of water users in the 2013 EDP, and affirm the dismissal of the breach of fiduciary duty and taking claims. We reverse the judgment and writ of mandate in all other respects, and remand with directions.

FACTUAL AND PROCEDURAL BACKGROUND[3]

The District "is the sole source of fresh water for the Imperial Valley, and all of that water comes from the Colorado River." (*Quantification Settlement Agreement Cases* (2011) 201 Cal.App.4th 758, 784 (*QSA Cases*).) Approximately 97 percent of the water that the District distributes is used for agriculture. Pursuant to the Quantification Settlement Agreement (QSA), a set of agreements reached in 2003 among the District, other Southern California water entities, and the government, which resolved long-standing water rights disputes, the District's entitlement was capped at 3.1 million acre-feet, subject to an overrun policy.[4] (*Id.* at p. 789) Following the QSA, the District instituted fallowing and efficiency-based conservation measures, retained experts to assess distribution in shortage situations, and eventually adopted an equitable distribution plan (EDP) for water shortage conditions, which apportioned water by category of user

---

[3]  The history of the District, and of water rights in the Imperial Valley generally, is extensive. We limit this initial overview and our discussions *post* to facts necessary for this appeal, and rely at times on prior cases that summarized these matters.

[4]  One acre foot is equivalent to 325,851 gallons.

and was revised multiple times. In October 2013, the District's Board adopted the 2013 EDP, which unlike previous EDPs, provides for an annual apportionment that does not require a shortage as a precondition to its implementation and is thus intended to be permanent. Pursuant to the 2013 EDP, water would be apportioned first to non-agricultural users, with remaining amounts apportioned among farmers using either a straight line method or another method chosen by the District. Farmers would be able to share water within farm units, and buy and sell water in a clearinghouse. At the same meeting, the Board approved a hybrid historical/straight line agricultural apportionment for 2014. As we discuss *post*, this meant that half the apportionment would be based on historical use, while the other half was a set amount of water per acre.

Abatti's family has been farming in the Imperial Valley for over 100 years. Abatti filed a petition for writ of mandate in the Imperial County superior court in November 2013 challenging the 2013 EDP, objecting to its prioritization of other users over farmers and the agricultural allocation in the 2013 EDP. The case was assigned to the Honorable Diane B. Altamirano. Abatti brought claims for mandamus under Code of Civil Procedure section 1085, declaratory relief, taking without compensation (taking), and breach of fiduciary duty.[5] The District challenged the action on multiple grounds in demurrers and in a motion to strike, claiming that the petition was untimely, that it was barred by a prior validation action, and that the petition did not state adequate allegations

---

[5]     Abatti also raised a claim for administrative mandamus, but subsequently dismissed that claim.

7

to support the breach of fiduciary duty and taking claims. The court struck the breach of fiduciary duty and taking claims, and allowed the remaining claims to proceed.

Abatti filed the operative third amended petition in November 2014, seeking mandamus and declaratory relief. The case was reassigned to the Honorable L. Brooks Anderholt. The District brought another motion to strike, which the court denied.

The superior court held a hearing on Abatti's petition in April 2017. In August 2017, the court issued a writ of mandate directing the District to repeal the 2013 EDP. In its statement of decision, the court (i) determined the parties' water rights; (ii) found that the District had abused its discretion by prioritizing other water users over farmers and by violating the "no injury" and appurtenancy rules; (iii) found that the District had also abused its discretion by using straight line agricultural apportionment as the default method in the 2013 EDP, rather than a historical method; and (iv) ruled that Abatti's action was not barred by the statute of limitations or by a prior validation action. The court also issued a declaratory judgment that prohibits the District from prioritizing any category of users over farmers, except domestic users; from using straight-line or hybrid agricultural apportionment, rather than historical; and from entering into contracts that guarantee water to any users other than domestic or agricultural users, during shortages.

The District appealed from the judgment and writ of mandate, and Abatti appealed from the dismissal of his breach of fiduciary duty and taking claims. The San Joaquin Tributaries Authority, Association of California Water Agencies, State Water Resources Control Board (State Board), and Imperial Valley Coalition for the Fair Sharing of Water (IVC) all applied to file amicus curiae briefs on behalf of the District. The Imperial

County Farm Bureau, Imperial Valley Vegetable Growers Association, and Imperial Valley Water together applied to file a brief on behalf of Abatti. We granted the applications, indicating that we would not consider newly raised issues. The parties filed answering briefs.[6]

## DISCUSSION

A. *Standard of review*

A writ of mandate under Code of Civil Procedure section 1085 (i.e., an ordinary mandamus action) compels the "performance of a legal duty imposed on a government official." (*Environmental Protection Information Center, Inc. v. Maxxam Corp.* (1992) 4 Cal.App.4th 1373, 1380; see *People ex rel. Younger v. County of El Dorado* (1971) 5 Cal.3d 480, 491 [describing ordinary mandamus actions].)

An ordinary mandamus suit "permits judicial review of . . . quasi-legislative acts of public agencies." (*Carrancho v. California Air Resources Board* (2003) 111 Cal.App.4th 1255, 1264-1265 (*Carrancho*).) " 'In reviewing such quasi-legislative decisions, the trial court does not inquire whether, if it had power to act in the first instance, it would have taken the action taken by the administrative agency. The

---

[6]     The parties and amicus IVC have filed a number of requests for judicial notice, as well as related declarations, oppositions, and objections. Most of the requested documents are not relevant or necessary to our determination of the issues raised in the present appeals (among other potential barriers to notice). (See *People v. Rowland* (1992) 4 Cal.4th 238, 268, fn. 6 (*Rowland*) [declining notice of irrelevant court records].) We grant judicial notice as to certain documents, as identified *post*. To the extent that our analysis calls for a discussion of why particular documents are not suitable for notice, we address those matters *post*, as well. We deny the remaining requests.

9

authority of the court is limited to determining whether the decision of the agency was arbitrary, capricious, entirely lacking in evidentiary support, or unlawfully or procedurally unfair.' " (*Id*. at p. 1265, quoting *Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 786.)

"The appellate court reviews the trial court's decision de novo under the same standard." (*California Bldg. Industry Ass'n v. San Joaquin Valley Air Pollution Control Dist*. (2009) 178 Cal.App.4th 120, 130; see *City of Arcadia v. State Water Resources Control Board* (2006) 135 Cal.App.4th 1392, 1409 [review is de novo, "except where the trial court made foundational factual findings, which are binding on appeal if supported by substantial evidence"].)[7]

B.      *Water rights in the Imperial Valley*

The parties' fundamental disagreement pertains to whether the farmers possess water rights that entitle them to receive the amounts of water that they have historically used to irrigate their crops, amounting to a priority over other non-domestic users, or instead, whether their interest is a right to water service that is subject to modification by

---

[7]      We reject certain of Abatti's assertions regarding the scope of review. First, Abatti disputes that the substantial evidence standard of review is at issue; however, application of the abuse of discretion standard will often call for an assessment of the sufficiency of the evidence to support the finding at issue. Second, Abatti argues that the superior court must conduct independent review if fundamental rights are involved. This principle applies to administrative, not ordinary, mandamus. (*Dominey v. Department of Personnel Administration* (1998) 205 Cal.App.3d 729, 738, fn. 5.) Finally, we disagree with Abatti's assertion that under *In Re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, we are bound by factual findings to which the District did not object. One must object to avoid implied findings (*id*. at pp. 1133-1134), but this does not mean that such findings are not subject to review for substantial evidence.

10

the District.  We thus begin with a threshold issue:  whether the superior court accurately determined the nature of the farmers' rights.  This analysis requires both historical and legal context.  Among other things, that context reflects that even if some landowners in the Imperial Valley held private water rights at some time in the past, the District is the sole owner of appropriative water rights to Colorado River water in the Imperial Valley; all users possess only a right to service in some form.

We first discuss the history of water rights and irrigation in the Imperial Valley. We then address California water and irrigation law, including as applied to irrigation districts and landowners.  Finally, we address the parties' arguments regarding the farmers' rights, and explain how the superior court erred in determining them.

1.     *Additional background*

Efforts to divert Colorado River water, and disputes regarding its use, began well over a century ago.  (*Arizona v. California* (1963) 373 U.S. 546, 552-562 (*Arizona I*).) This history was marked by "the inability of local groups or individual States to deal with these enormous problems; the continued failure of the States to agree on how to conserve and divide the waters; and the ultimate action by Congress at the request of the States creating a great system of dams and public works nationally built, controlled, and operated for the purpose of conserving and distributing the water."  (*Id.* at p. 552.)  The *QSA Cases* decision discusses this history in detail.  (*QSA Cases*, *supra*, 201 Cal.App.4th at pp. 776-792.)  For our purposes, it suffices to highlight certain salient events, as well as matters particular to California irrigation history and the District.

11

California enacted the Wright Act in 1887, which "gave irrigation districts the power to construct and maintain irrigation and drainage systems," and passed amended versions in the decades to follow. (*Turlock Irr. Dist. v. Hetrick* (1999) 71 Cal.App.4th 948, 951.)

The District's predecessor, the California Development Company (CDC), was formed in the late 1890's to irrigate the Imperial Valley with diverted Colorado River water. (See *Thayer v. Cal. Dev. Co.* (1912) 164 Cal. 117, 120 (*Thayer*).) The CDC posted a notice of appropriation. (*Ibid*.)[8] Individuals also posted notices of appropriation, and later assigned their rights to the CDC. The CDC organized mutual water companies to facilitate distribution to stockholders. (*Id*. at pp. 122-123; see *ibid*. [landowners could purchase stock, which entitled them to a certain amount of water per share].) Water was also furnished to the City of Imperial and to a power company. (*Id*. at p. 123.) Southern Pacific Company took a controlling interest in CDC, and later foreclosed.

In 1902, Congress enacted the Reclamation Act, to facilitate water reclamation in the West through the construction and operation of dams, reservoirs, and canals. (*California v. U.S.* (1978) 438 U.S. 645, 648-650.) The Reclamation Act and supplemental legislation "generally limited to 160 acres the amount of private land in single ownership eligible to receive water from a reclamation project." (*Bryant v. Yellen*

---

[8]    A notice of appropriation was an early method of asserting appropriative rights, as was actual use. (Civ. Code, § 1415; *De Necochea v. Curtis* (1889) 80 Cal. 397, 407-408 (*Curtis*).) We discuss appropriative rights in more detail, *post*.

12

(1980) 447 U.S. 352, 360, 368, fn. 19 (*Bryant*); see *id*. at p. 365 [parties included class representatives for Imperial Valley landowners with more than 160 acres].)  However, the Reclamation Act provided that it would not " 'affect any right of any State . . . or of any . . . user of water in, to, or from any interstate stream or the waters thereof.' " (*Arizona I*, *supra*, 373 U.S. at p. 623.)

The District was organized in 1911.  It posted a notice of appropriation in 1913, then acquired the CDC's water rights in 1916 from the Southern Pacific Company following foreclosure, and absorbed the mutual water companies between 1922 and 1923. The District has been "solely responsible since that time for the diversion, transportation, and distribution of water from the Colorado River to the Imperial Valley."  (*Bryant*, *supra*, 447 U.S. at p. 357, fn. 3.)[9]

Efforts to divert water from the Colorado River continued in California and the other basin states—Wyoming, Colorado, Utah, New Mexico, Arizona, and Nevada. (*QSA Cases*, *supra*, 201 Cal.App.4th at pp. 777-778.)  In 1922, these states entered a compact (1922 Compact) to, among other things, apportion water between the lower and

---

[9]     Abatti contends that farmers formed the District, while the District states that it was established by popular vote.  These claims are not necessarily at odds; current law requires landowner support for a petition to form a water district, but permits all residents to vote on formation.  (*Choudhry v. Free* (1976) 17 Cal.3d 660, 662-663 (*Choudhry*).)  In any event, the parties do not explain how the manner in which the district was originally formed impacts its status once formed.  Abatti's amici contend that Imperial Valley landowners founded the CDC, but they cite nothing to support this assertion.  (Cf. *Thayer*, *supra*, 164 Cal. at p. 121 [when CDC was organized, Imperial Valley "was unoccupied . . . and substantially the whole thereof was surveyed public land"]; *Arizona I*, *supra*, 373 U.S. at pp. 552-553 ["group of people interested" in Imperial Valley had idea to divert water].)

upper basins.  (*Id*. at p. 779.)  Article VIII of the compact stated that "[p]resent perfected rights to the beneficial use of waters of the Colorado River System are unimpaired by this compact."

In 1928, Congress passed the Boulder Canyon Project Act (Project Act), which incorporated the 1922 Compact, and went into effect on June 25, 1929.  (Pub. L. No. 70-642, 45 Stat. 1057, codified as amended at 43 U.S.C. §§ 617-619.)  The Project Act authorized the construction of "a dam and other works" to regulate the river and distribute water, among other purposes.  (*QSA Cases*, *supra*, 201 Cal.App.4th at p. 780.)  It also incorporated a "complete statutory apportionment intended to put an end to the long-standing dispute over Colorado River waters."  (*Ibid*.)  Under the Project Act, California was limited to 4.4 million acre-feet (MAF), and certain surplus amounts.  (*Id*. at p. 782.)  Section 6 stated that "the dam and reservoir provided for by section 1 hereof shall be used:  First, for river regulation, improvement of navigation, and flood control; second, for irrigation and domestic uses and satisfaction of present perfected rights in pursuance of Article VIII of said Colorado River compact; and third, for power."  (43 U.S.C. § 617e.)

In 1931, the District and other California water entities entered into a Seven-Party Water Agreement.  The District's priorities entitled it to amounts not to exceed 3.85 MAF under that agreement.  In 1932, the District entered into a contract with the United States for water delivery consistent with those priorities, the 1922 Compact, and the Project Act, and for dam and canal construction (1932 Contract).

The District applied for a permit from the predecessor to the State Board in 1933, and in 1950 it received Permit No. 7643 to appropriate up to 3.85 MAF of Colorado River water annually. The permit indicated that the water would be for domestic and irrigation use. The permit further provided that it was subject to vested rights and was without prejudice to rights under appropriation. Municipal use was added to the District's permit in or after 2002.

Arizona sued to resolve disputes concerning the allocation of water from the Colorado River, including whether state law would control allocation. This led to the United States Supreme Court decision in *Arizona I*. (*Arizona I*, *supra*, 373 U.S. at p. 560.) In that case, the Court held that allocation of Colorado River water is governed by "the [Project] Act and the Secretary [of the Interior's] contracts, not the law of prior appropriation . . . ." (*Id.* at pp. 585-586.) The Court noted that "[o]ne of the most significant limitations in the Act is that the Secretary is required to satisfy present perfected rights, a matter of intense importance to those who had reduced their water rights to actual beneficial use at the time the Act became effective." (*Id*. at p. 584, citing § 6 of the Project Act.) In a 1964 decree, the Court defined "perfected right" as "a water right acquired in accordance with state law, which right has been exercised by the actual diversion of a specific quantity of water that has been applied to a defined area of land or to definite municipal or industrial works. . . ." (*Arizona v. California* (1964) 376 U.S. 340, 341 (*Arizona II*).) The Court defined "present perfected rights" as rights perfected as of June 25, 1929, the effective date of the Project Act. (*Ibid.*) In 1979, the Court entered a decree setting forth the present perfected rights. (*Arizona v. California* (1979)

15

439 U.S. 419 (*Arizona III*).)  The decree stated that the District had present perfected rights in "annual quantities not to exceed (i) 2,600,000 acre-feet of diversions from the mainstream or (ii) the quantity of mainstream water necessary to supply the consumptive use required for irrigation of 424,145 acres and for the satisfaction of related uses, whichever of (i) or (ii) is less, with a priority date of 1901."  (*Id*. at p. 429.)[10]

California was able to continue using more than its allotment of Colorado River water, until other states increased their use.  (*QSA Cases*, *supra*, 201 Cal.App.4th at pp. 773, 785.)  In the 1990's, the federal government required that California implement a strategy to limit its water use.  (*Id*. at p. 788.)  Negotiations over water issues in Southern California culminated in the 2003 QSA and related arrangements, which were intended to resolve disputes among the District, other Southern California water entities, and the government about priority, use, and water transfers.  The QSA limited the District's entitlement to 3.1 MAF.  (*Id*. at p. 784.)

The 2013 EDP and this litigation eventually followed, as we discuss *post*.  The superior court addressed the parties' rights in its statement of decision.  The court determined that the District holds "appropriative rights to Colorado River water"; that its property is "in trust for its use and purposes"; and that the District is required to establish rules for equitable water distribution under Water Code section 22252.[11]  The court also

---

[10]    Additional proceedings followed in *Arizona*, but they do not impact this appeal.

[11]    Further statutory references are to the Water Code, unless noted.  We still identify the Water Code as needed for purposes of clarity.

16

determined that the District's users "own the equitable and beneficial interest in the water rights," and that the "farmers' equitable and beneficial interest in the water rights is appurtenant to their lands and is a constitutionally protected property right." The court proceeded to find that the "beneficial use of Colorado River water . . . in the early 1900s" by farmers, including Abatti's ancestors, perfected the District's water rights (and, subsequently, that the "only source" of District water is from rights acquired through "agricultural interests in the Imperial Valley").[12]

2. *Applicable law*

a. *Overview of California water law*

"California operates under a 'dual' or hybrid system of water rights which recognizes both doctrines of riparian rights and appropriation rights." (*United States v. State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82, 101 (*United States*).) "The riparian doctrine confers upon the owner of land the right to divert the water flowing by his land for use upon his land. . . ." (*Ibid.*; see *Santa Barbara Channelkeeper v. City of San Buenaventura* (2018) 19 Cal.App.5th 1176, 1183-1184 (*Channelkeeper*) [noting similar principles govern groundwater rights].)

Appropriative rights "confer[] upon one who actually diverts and uses water the right to do so provided that the water is used for reasonable and beneficial uses and is

---

[12]    The parties use the term "Law of the River," which refers to the federal obligations "that govern the allocation and use of the water of the Colorado River." (*Grand Canyon Trust v. U.S. Bureau of Reclamation* (9th Cir. 2012) 691 F.3d 1008, 1019, fn. 13.) We refer instead to the specific authorities, as necessary to our discussion.

surplus to that used by riparians or earlier appropriators." (*United States*, *supra*, 182 Cal.App.3d at pp. 101-102; *Nicoll v. Rudnick* (2008) 160 Cal.App.4th 550, 556 (*Nicoll*) [" 'Both riparian and appropriative rights are usufructuary only and confer no right of private ownership in the watercourse.' "].)  "Although there is no private property right in the corpus of the water . . . , the right to its use is classified as real property." (*Fullerton v. State Water Resources Control Bd*. (1979) 90 Cal.App.3d 590, 598.)  Appropriative water rights are ordinarily appurtenant to the land.  (*Ibid.*)

Abatti emphasizes the appurtenant nature of the farmers' rights, so we briefly address the meaning of the term.  An "appurtenance" is "something attached to something else," and has long been used in reference to land and easements.  (Black's Law Dict. (11th ed. 2019); *ibid*. ["appurtenant rights" cross-references to "secondary easement," one "appurtenant to the primary . . . easement; the right to do things . . . necessary to fully enjoy the easement"].)  Accordingly, Civil Code section 662 defines an appurtenance to land as a "thing . . . deemed to be incidental or appurtenant to land when it is by right used with the land for its benefit, as in the case of a way, or watercourse, or of a passage for light, air, or heat . . . ."  Thus, "appurtenant" denotes that the water right or interest is attached to land, but does not denote its type or scope.  (See, e.g., *Stanislaus Water Co. v. Bachman* (1908) 152 Cal. 716, 724 [contractual right to water delivery for irrigating specific land became easement appurtenant]; *City of Pasadena v. City of Alhambra* (1949) 33 Cal.2d 908, 925 [overlying water right "is based on ownership of the land and is appurtenant thereto"]; *Nicoll*, *supra*, 160 Cal.App.4th at p. 561 [appropriative right was appurtenant to entire property, and subsequent owner was entitled to portion thereof].)

Thus, an appurtenant, appropriative water right is one associated with land. A right to water service can also be appurtenant to land (*Erwin v. Gage* (1964) 226 Cal.App.2d 189, 194 (*Erwin*)), and as discussed in more detail *post*, that is the appurtenant right held by the farmers.

"Initially, rights to appropriate water were acquired by actual diversion and use of the water." (*United States*, *supra*, 182 Cal.App.3d at p. 102; *see Curtis*, *supra*, 80 Cal. at pp. 407-408 [addressing notice of appropriation as another way to assert appropriative rights].) "Beginning in 1914, however, a statutory scheme has provided the exclusive method of acquiring appropriation rights" in California. (*United States*, at p. 102.) An application is made to the State Board "for a permit authorizing . . . the taking and use of a specified quantity of water." (*Ibid*; see § 1201, et seq.)

"Superimposed on the dual system for defining water rights are two limiting principles. First is the rule of reasonableness: 'the overriding constitutional limitation that the water be used as reasonably required for the beneficial use to be served.' " (*Channelkeeper*, *supra*, 19 Cal.App.5th at p. 1184; see Cal. Const. Art. X, § 2, ["conservation of . . . waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare"]; *Channelkeeper*, at p. 1184 [right to use water is limited to that " ' reasonably required for the beneficial use to be served' "].) Reasonable use is "dependent upon not only the entire circumstances presented but varies as the current situation changes." (*Environmental Defense Fund v. E. Bay Mun. Util. Dist.* (1980) 26 Cal. 3d 183, 194.) Beneficial uses are "categories of water use." (*Channelkeeper*, at p. 1185.) Under Water

Code section 106, it is "the established policy of this State that the use of water for domestic purposes is the highest use of water and that the next highest use is for irrigation." Other beneficial uses include municipal, industrial, and aquaculture. (Cal. Code Regs., tit. 23, § 659, et seq.)

A second limit on water rights is "the public trust doctrine." (*Channelkeeper*, *supra*, 19 Cal.App.5th at p. 1184.) This doctrine derives from the principle that water is a shared resource, and has been applied to find that " 'parties acquiring rights in trust property,' such as water flowing in a stream, 'generally hold those rights subject to the trust . . . .' " (*Id.* at p. 1186.)

### b. *Irrigation districts*

The current Irrigation District Law was enacted in 1943. (Wat. Code, § 20500, et seq.) Section 22437 provides that "[t]he title to all property acquired by a district is held in trust for its uses and purposes." Earlier irrigation acts contained similar provisions. (Wright Act, § 13 [property acquired by the district would be held "in trust" and "dedicated and set apart to the uses and purposes" under the act]; Wright-Bridgford Act, § 29 [accord].) Property includes "all real and personal property, including water, water rights, works, franchises, concessions and rights." (§ 20529; see *ibid.* [except as applied to assessments].)

"The ultimate purpose of a district organized under the Irrigation Act is the improvement, by irrigation, of the lands within the district." (*Jenison v. Redfield* (1906) 149 Cal. 500, 503 (*Jenison*).) Their core purposes include supporting other beneficial uses as well. (*Crawford v. Imperial Irr. Dist.* (1927) 200 Cal. 318, 329 (*Crawford*)

20

["prime object and purpose" is to "provide water for the use of its inhabitants and land owners for irrigation and domestic purposes"]; *City of Modesto v. Modesto Irrigation Dist.* (1973) 34 Cal.App.3d 504, 507 (*Modesto*) [district's "main purpose is to develop, preserve and conserve water for the beneficial use of the inhabitants"].)

A primary duty of irrigation districts is to distribute water. Statutory provisions govern distribution. Section 22252, the provision under which the District distributes water, provides: "When any charges for the use of water are fixed by a district the water for the use of which the charges have been fixed shall be distributed equitably as determined by the board among those offering to make the required payment." Irrigation districts have other responsibilities as well, including drainage, electrical power, and flood control. (§ 22075, et seq.)

Multiple provisions of the Water Code authorize irrigation districts to carry out their purposes and duties and accord them broad discretion in doing so. (See, e.g., § 22075 ["A district may do any act necessary to furnish sufficient water in the district for any beneficial use"]; § 22076 ["A district may do any act in order to put to any beneficial use any water under its control"]; § 22225 ["Each district has the power generally to perform all acts necessary to carry out fully the provisions of this division"]; see also § 22437 ["The district may hold, use, acquire, manage, sell, or lease the property as provided in this division"]; see *Baldwin Park Cnty. Water Dist. v. Cnty. of Los Angeles* (1962) 208 Cal.App.2d 87, 90 (*Baldwin Park*) ["Legislature has given broad powers to irrigation districts with respect to the control and distribution of water"]; *Crawford*, *supra*, 200 Cal. at p. 329 [powers are "broad and comprehensive"].)

21

Finally, California courts have long held that irrigation districts operate in a public capacity. (See *Jenison*, *supra*, 149 Cal. at p. 503 [irrigation district "when formed is a public corporation"]; *Clough v. Compton-Delevan Irr. Dist.* (1938) 12 Cal.2d 385, 388 (*Clough*) [addressing Wright-Bridgford Act § 29, regarding property being held in trust: "The property is by this language impressed with the public use"]; *Allen v. Hussey* (1950) 101 Cal.App.2d 457, 467 (*Allen*) [irrigation district is "an active trust for public uses and purposes"].)

### c. *Irrigating landowners*

In *Merchants' National Bank of San Diego v. Escondido Irrigation District* (1904) 144 Cal. 329 (*Merchants*), the California Supreme Court held that landowners have a beneficial and equitable interest in the irrigation district's property, consisting of a right to use or service:

> "[T]he [irrigation district] is distinguished from ordinary municipal corporations by the fact that 'the legal title,' only of the property of the corporation is vested in the district, 'in trust for the uses and purposes set forth in [the] act'; and that the beneficiaries of the trust[,] who, upon familiar equitable principles, are to be regarded as the owners of the property[,] are the landowners in the district . . . and in whom, indeed, is vested . . . in each, the right to the several use of a definite proportion of the water of the district, and in all, in common, the equitable ownership of its water rights . . . as the means of supplying water. (Stats. 1887 . . . , secs. 11, 13 [Wright Act].)"

(*Id.* at p. 334; *ibid.* [rejecting lender's claim to district's water system], limited on other grounds in *La Mesa, Lemon Grove & Spring Val. Irr. Dist. v. Halley* (1925) 197 Cal. 50, 59-60.) The *Merchants* court further explained that these rights are indistinguishable

22

"from other private rights," and are protected under the state and federal constitutions. (*Merchants*, at p. 334.)

The California Supreme Court applied these principles in subsequent cases. (See, e.g., *Hall v. Sup. Ct.* (1926) 198 Cal. 373, 376-378, 383 (*Hall*) [affirming injunction barring landowner Imperial County judges from presiding over an action for damages against a water company whose interests were purchased by the District; as "equitable owners" of District property, they had a proprietary interest in the case].) In the *Ivanhoe Irrigation District* litigation, the California Supreme Court affirmed the rejection of a federal contract that incorporated the Reclamation Act's 160-acre limit. (*Ivanhoe Irr. Dist. v. All Parties* (1957) 47 Cal.2d 597, 606-607, 625 (*Ivanhoe I*), rev'd on other grounds *sub nom. Ivanhoe Irr. Dist. v. McCracken* (1958) 357 U.S. 275 (*Ivanhoe II*).) The Court reasoned that the state functioned as a trustee of its domestic waters for the benefit of users, and that under state law, the right to use water could not be limited based on acreage; the Reclamation Act prohibited interference with state law; and the interest of the United States was thus subject to the terms of the trust. (*Ivanhoe I*, at pp. 625-628, 637-638.) In reaching this conclusion, the Court observed that "[i]t has long been the

23

established law of the state that an irrigation district is trustee for the landowners," citing *Merchants* and other cases. (*Id.* at p. 625.)[13]

In *Bryant*, the United States Supreme Court addressed the relationship between irrigation districts and landowners in concluding that the Reclamation Act's 160-acre cap limit did not apply to District lands for which the District held present perfected rights. (*Bryant*, *supra*, 447 U.S. at p. 356.) The Court rejected the Ninth Circuit's view that "landowners . . . were merely members of a class" for whom the water was held in trust, and that the 160-acre limit "would merely require reallocation . . . ." (*Id.* at p. 369.) The Court determined that the Ninth Circuit had failed to take adequate account of *Arizona*, in which the Court had "recognized that § 6 of the Project Act, requiring satisfaction of present perfected rights" was a limit on the government's power. (*Id.* at pp. 370-371.) The Court explained:

> "It may be true . . . that no individual farm in the District has a permanent right to any specific proportion of the water held in trust by the District. But there is no doubt that prior to 1929 the District, in exercising its rights as trustee, delivered water to individual farmer beneficiaries without regard to the amount of land under single ownership. . . . Indeed, as a matter of state law, not only did the District's water right entitle it to deliver water to the farms in the District regardless of size, but also the right was equitably owned by the beneficiaries to whom the District was obligated to deliver

---

13     The United States Supreme Court reversed, holding that the federal contract incorporating the Reclamation Act limit there was valid, for reasons not pertinent to this appeal. (*Ivanhoe II*, at p. 278.) On remand, the California Supreme Court repudiated the trust theory as to the state, but did not revisit the relationship between the irrigation district as trustee and its users. (*Ivanhoe Irr. Dist. v. All Parties* (1960) 53 Cal.2d 692, 715-716 (*Ivanhoe III*).)

water." (*Id*. at p. 371, citing *Ivanhoe I*, *supra*, 47 Cal.2d at pp. 624-625.)

(See *Bryant*, at p. 371, fn. 23 [landowners have "legally enforceable right, appurtenant to their lands, to continued service by the District," citing, inter alia, *Erwin*, *supra*, 226 Cal.App.2d at pp. 194-195]; see also *Bryant,* at p. 356, fn. 1 [District is "empowered to distribute and otherwise administer water for the beneficial use of its inhabitants"].)[14]

At the same time, the California Supreme Court has held that landowner water rights are subordinate to District purposes. (*Jenison*, *supra*, 149 Cal. at pp. 503-504 ["The right of a landowner of the district to the use of the water . . . is a right to be exercised in consonance with and in furtherance of such ultimate purpose,—viz. for the improvement by irrigation of lands within the district,—and in no other way. *His right is always in subordination to the ultimate purpose of the trust*"], italics added).

The foregoing authorities reflect that irrigating landowners like Abatti possess an equitable and beneficial interest in the District's appropriative water rights that is appurtenant to their lands and consists of a right to service.

---

14    The Court observed that the District is required "to apportion water . . . ratably to each landowner in accordance with his share of the total assessments," citing section 22250. (*Bryant*, at p. 371, fn. 23.)  The Court was referring to an assessment system that is no longer in use, and we do not view this statement as impacting its larger analysis. Separately, we reject amicus State Board's contention that *Bryant* mistakenly relied on the trust theory repudiated in *Ivanhoe III*.  The Court noted all three *Ivanhoe* decisions, and *Ivanhoe III* did not repudiate the theory as to irrigation districts. (*Bryant*, *supra*, 447 U.S. at pp. 371, fn. 23, 377; *Ivanhoe III*, *supra*, 53 Cal.2d at pp. 715-716.)

25

3.    *Analysis*

Having reviewed the historical and legal landscape, we now turn to the parties' arguments and the superior court's conclusions regarding the nature of farmers' rights.

a.    *Parties' arguments regarding farmers' rights*

We begin with Abatti, who makes a number of arguments to support his view of farmers' rights.[15]  None has merit.

As a preliminary matter, Abatti contends that the District's purpose is to enable landowners to irrigate and that its powers are "narrower" than those of other municipal corporations.  However, the District's purposes and powers extend beyond irrigation, as discussed *ante*, and it is obligated to provide equitable service to all beneficial users; the authority held by other municipal entities is irrelevant.  (See *Crawford*, *supra*, 200 Cal. at pp. 325-326, 329 [irrigation district is not a municipal corporation, but it is a " 'public corporation for municipal purposes,' " with broad powers]; see *Modesto Irrigation Dist. v. Pacific Gas and Elec. Co.* (N.D. Cal. 2004) 309 F.Supp.2d 1156, 1164-1165 [" 'municipal corporation' label is neither talismanic nor particularly instructive"].)

---

[15]     We limit our discussion of Abatti's arguments to issues properly raised in his combined brief.  The District and Abatti briefed the parties' rights in connection with the District's appeal.  However, Abatti devoted much of his cross-appellant's reply brief to the issue, including addressing the reply portion of the District's combined brief, under the guise of "establishing the . . . water rights" to show that the breach and taking claims have merit.  We do not consider these points.  (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 268 [cross-appellant " 'may not use its cross-appellant's reply brief to answer points raised in the appellant's reply brief.' "].)  We also do not consider arguments newly raised in the amicus answer briefing.

Turning to Abatti's central argument, he contends that the farmers have vested, appurtenant property rights to use water for their "reasonable irrigation needs" and in their "usual manner," and that they should have priority over other non-domestic users. As noted *ante*, Abatti is essentially arguing that farmers have a right to receive the amounts of water that they have historically used to irrigate their crops. This argument is contrary to both the case law regarding irrigation districts and their users, and the principle of reasonable use. (See *Merchants*, *supra*, 144 Cal. at pp. 333-334 [landowners have right to "several use of a definite proportion of the water of the district, and in all, in common, the equitable ownership of its water-rights"]; *Modesto*, *supra*, 34 Cal.App.3d at p. 507 [district's purpose is to "develop, preserve, and conserve" water for "beneficial use of the inhabitants"]; *Bryant*, *supra*, 447 U.S. at p. 371 [no farm in the District has "permanent right to any specific proportion of the water"]; *cf. Allegretti & Co. v. County of Imperial* (2006) 138 Cal.App.4th 1261, 1279 (*Allegretti*) [overlying user's "claim to an unlimited right to use as much water as it needs to irrigate flies in the face" of reasonable use standard].)

Abatti's position appears to be that historical use by the farmers' ancestors established their vested rights to continue to receive the amounts of water that they have been using to meet their irrigation needs, as equitable and beneficial owners of appurtenant interests in the District's water rights, and that these vested rights have been preserved, including in the District's permit. He relies on authority holding that appurtenant water rights are measured by reasonable use. However, Abatti does not establish that the farmers possessed any such vested rights in the first place.

27

The farmers may have a vested, appurtenant right, but that right consists of an appurtenant right *to service*, not an appurtenant water right. *Erwin* recognized this distinction in rejecting a shareholder effort to block a canal company settlement. (*Erwin*, *supra*, 226 Cal.App.2d at p. 192.) The court found that the shareholders' position "presuppose[d] that it is the water right itself . . . that is appurtenant to the land of each shareholder," but that the real issue was "whether it is the water right or simply the right to receive water, that is appurtenant . . ." (*Ibid*.) Looking to the company's history of conveyances, the court concluded that the shareholders "own a right to have water delivered . . . ." (*Id*. at pp. 193.)

Similarly, here, the farmers have an appurtenant right to water service, rather than an appurtenant water right, dictated by the history of water rights in the Imperial Valley and by the law governing irrigation districts.[16] Present perfected rights based primarily on agriculture do form a basis for the District's entitlement to Colorado River water,[17] but as the United States Supreme Court's decree in *Arizona* made clear, those rights are held by the District, not the farmers. (*Arizona III*, *supra*, 439 U.S. at p. 429.) And it is the District that holds title to the appropriative rights to the Colorado River water that

---

[16] Cf. *Empire West Side Irrigation Dist. v. Lovelace* (1970) 5 Cal.App.3d 911, 913 [distinguishing *Erwin* in concluding landowners could challenge agreement between irrigation districts, where it was previously determined that one of the water entities was trustee for water rights that remained with certain lands].)

[17] The District's present perfected rights entitle it to the lesser of 2.6 MAF or enough water to service certain acreage. (*Arizona III*, *supra*, 439 U.S. at p. 429.) The Seven Party Agreement allows for 3.85 MAF, which was limited to 3.1 MAF under the QSA.

28

comes into the Imperial Valley; as discussed *post*, Abatti does not establish the farmers hold any pre-1914 rights. Thus, the farmers do not hold traditional appropriative rights entitling them to "divert[] and use[] water" (*United States*, *supra*, 182 Cal.App.3d at pp. 101-102), other than as beneficial owners of the District's rights. That beneficial ownership entitles them only to water service from the District.

In turn, Abatti's reliance on the principle that "[t]he appurtenant water right is 'measured by the amount of water that is reasonably and beneficially used on the land' " is misplaced. It is true that with appropriative water rights acquired by use, "the extent of the right . . . is limited to the amount of water applied to a beneficial use" and "reasonably necessary" for that use. (*Haight v. Costanich* (1920) 184 Cal. 426, 431; cf. 43 U.S.C. § 372 [beneficial use is the measure of the right to use water acquired under the Reclamation Act].) Reasonable use is also a limit on all water rights, as discussed *ante*. (*Channelkeeper*, *supra*, 19 Cal.App.5th at p. 1184.) But, again, the farmers do not hold appurtenant water rights; they hold appurtenant rights to water service.

Having failed to establish any entitlement to a particular level of continued water service, Abatti's position amounts to an assumption that the appurtenant nature of the farmers' right to service—the fact that it is linked to their land—renders it superior to other users' rights to water service. We are not persuaded. All beneficial users have a right to service, consistent with the District's statutory obligations to equitably distribute

29

water.  Although some users may warrant different treatment in that distribution, the right itself remains one to water service.[18]

However, we reject the District's argument that "a constitutionally protected property right—as opposed to continued service of water—is inconsistent with statutory and extensive case law."  The District presents a false dichotomy.  The farmers are beneficial owners of the District's water rights, which entitles them to a right to service, and that right is constitutionally protected.  Thus, the farmers are entitled to appropriate consideration in the District's equitable distribution of water to all of its users.  The cases cited by the District illustrate that users cannot acquire legal ownership of district property, including water rights, or receive water outside the district—*not* that farmers lack beneficial ownership interests.  (See, e.g., *Glenn Colusa Irrigation District v. Paulson* (1925) 75 Cal.App. 57, 69, 71-72 ["no private estate can be created in property devoted to a public use"]; *Hildreth v. Montecito Creek Water Co.* (1903) 139 Cal. 22, 24, 29 [beneficiaries had no rights to private ownership of water]; *Madera Irrigation District v. All Persons, Etc.* (1957) 47 Cal.2d 681, 691-693, rev'd on other grounds *sub nom*. in

18      We recognize that deprivation of a beneficial ownership right could potentially give rise to remedies different from remedies available for deprivation of other rights, but this does not change the nature of the entitlement itself.  *Lindsay-Strathmore Irr. Dist. v. Wutchumna Water Co.* (1931) 111 Cal.App. 688, cited by Abatti here, does not aid him. The case involved an irrigation district's entitlement to a particular share of water from a water company, not a water user's entitlement to a particular amount of water from an irrigation district, and is otherwise distinguishable.  (*Id*. at pp. 701-702 [after irrigation district purchased stock in water company, company passed resolution limiting water deliveries; resolution was discriminatory and void insofar as it interfered with district's "right . . . to receive the proportion of water to which it was entitled by virtue of its shares of stock"].)

*Ivanhoe II* [owners of lands excluded from district could not receive water, as there was no right to receive water outside the district; indicating nothing therein was inconsistent with cases holding that irrigation district members are "beneficial owners" of its water rights].)[19]

In what appears to be a separate effort to diminish the nature of farmers' rights, the District contends that "the Irrigation District Law does not create a trust in the classic probate sense." Irrigation districts hold their property in trust under the Water Code, not the Probate Code, but landowners still hold a beneficial interest in that property. (§ 22437; *Merchants*, *supra*, 144 Cal. at pp. 333-334.)[20]

---

[19] The District also cites section 22262, which provides that "[n]o right in any water or water right owned by the district shall be acquired by use . . . ." It elsewhere argues that the section underscores that historical use cannot ripen into entitlement. Abatti contends that the section "can only be read to prevent new water users" from claiming an interest. Neither party provides any statutory analysis, and we do not address these points further. We note that water service has been recognized as a property interest in other contexts. (Cf., e.g., *Erwin*, *supra*, 226 Cal.App.2d at p. 194; *De Boni Corp. v. Del Norte Water Co.* (2011) 200 Cal.App.4th 1163, 1167-1168 ["shareholder's stake in a mutual water company is a property interest," with consumers entitled to receive water].)

[20] We also reject the District's reliance on *Clough*, *supra*,12 Cal.2d at pp. 388-389 to contend that "it is futile to attempt to discover the 'beneficiaries . . . .' " *Clough* was one of multiple cases addressing the rights of bondholders in irrigation districts. (*Id*. at pp. 387-388; *El Camino Irr. Dist. v. El Camino Land Corp.* (1938) 12 Cal.2d 378, 380-381; *Provident v. Zumwalt* (1938) 12 Cal.2d 365, 368.) The Court disagreed that bondholders could be exclusive beneficiaries and thus rejected partition of district land as a remedy (*Clough*, at pp. 388-389), but the Court confirmed elsewhere that a trust must have beneficiaries. (*Zumwalt*, at p. 375 ["It would be manifestly absurd to say that although property is held in trust, none of the benefits of the trust accrue to the beneficiaries"].)

Abatti raises two related issues here.  First, Abatti contends that because the District's predecessor, the CDC, held water rights for private use, those rights remained private following establishment of the District.  The District responds that it is a public entity, and that there was no reservation of title at the time it purchased from the Southern Pacific Company the water rights that the CDC had previously held.  We need not delve into the contours of title reservation, but we agree with the District's general point:  an irrigation district is public.  Absent *some* indication that property conveyed to the District was to remain separate and private, we see no basis for treating it as such.  (*Erwin*, *supra*, 226 Cal.App.2d at pp. 193-194 [canal company shareholders who possessed only right to service could not block settlement; history "reflect[ed] no reservation of title by the owners who conveyed the various water rights"].)

The cases that Abatti cites do not support his position.  *Thayer* confirmed that the CDC had not dedicated water to public use, in reversing a judgment requiring water delivery to a landowner who did not own mutual water company stock.  (*Thayer*, *supra*, 164 Cal. at pp. 121-124, 131, 138.) That case was filed in 1910, before the District was even formed, and decided in 1912; the *Thayer* court thus had no occasion to address the District's later acquisition of the CDC's water rights and its absorption of the water companies.  (*Id*. at p. 120.)  Abatti's reliance on cases holding that one who acquires water rights must maintain water service is likewise misplaced.  (See, e.g., *City of South Pasadena v. Pasadena Land & Water Co.* (1908) 152 Cal. 579, 586-588 (*South Pasadena*) [transfer of water rights from company to city did not relieve service obligation; mandamus could "compel the continuance of the distribution, in the usual and

32

proper manner"]; *Brooks v. Oakdale Irr. Dist.* (1928) 90 Cal.App. 225, 240-241 [grantees of water system had obligation to continue same service].)  The issue is not whether the District had to continue to provide service upon acquiring its water rights; that appears to be undisputed.  *Hall* is simply inapposite.  (*Hall*, *supra*, 198 Cal. at p. 383 [landowner judges had proprietary interest].)[21]

Second, Abatti contends that, "the [District's] [f]armers have pre-1914 water rights" (i.e., appropriative rights acquired through use or notice prior to the current statutory regime).  Abatti raised this argument in the superior court.  The court did not find that farmers possessed such rights but instead, found that the farmers hold a beneficial and equitable interest in the District's water rights.  Abatti does not contend on appeal that this finding is erroneous.  Further, Abatti identifies no evidence that would support a finding that farmers in the District possess pre-1914 water rights.  His 2013 declaration states that his "family established itself in Imperial County over one hundred years ago and has farmed land in the valley since that time," but does not state that they

---

[21]    Abatti also cites *Greeson v. Imperial Irr. Dist.* (S.D. Cal. 1931) 55 F.2d 321, aff'd, 59 F.2d 529 (9th Cir. 1932) to support his contention that the "Ninth Circuit recognized that . . . [the District], as successor-in-interest . . . was obligated to honor the landowners' 'vested . . . right to have the supply continued [which right] becomes in the nature of an appurtenance to the land.' "  *Greeson* involved a landowner challenge to the 1932 Contract; the district court rejected it, because there was no present threat to the landowners' interests (55 F.2d at p. 325); and the Ninth Circuit affirmed.  The quoted language is from the district court, which itself was quoting *South Pasadena*, and is not dispositive, for the reasons discussed *ante*.  In its affirmance, the Ninth Circuit emphasized that the matter at issue was "not one alone affecting an individual citizen," and, rather, that water must be apportioned "for the common good."  (59 F.2d at p. 533.)

owned the water rights.  As noted, other individuals did hold appropriative rights, but later assigned them to the CDC.[22]

        b.     *The superior court erred in determining the farmers' rights*

The superior court erred in determining the farmers' rights by embracing Abatti's unduly narrow view of the District's purposes and his overly expansive view of farmers' rights.

First, the superior court focused on the District's distribution of water, and mainly as to farmers, consistent with Abatti's limited view of the District's purpose—but inconsistent with California law.  As discussed above, the District's purpose is not only to support irrigation, but also to furnish and conserve water for *all* beneficial users (e.g., *Jenison*, *supra*, 149 Cal. at p. 503; *Modesto*, *supra*, 34 Cal.App.3d at p. 507), and the District has broad powers to "control and distribut[e]" water consistent with these purposes.  (*Baldwin Park*, *supra*, 208 Cal.App.2d at p. 90; see, e.g., § 22075 [district may do "any act necessary" to furnish water in district "for any beneficial use"].)  Further, a

---

22    Additionally, although pre-1914 rights holders do not need a State Board permit, they are subject to its oversight and must file a statement of diversion and use.  (*Cal. Farm Bureau Fed. v. State Water Res. Control Bd.* (2011) 51 Cal.4th 421, 428-429; § 5101.)  Abatti has not established that he or other District farmers have filed such statements with the State Board, and the State Board has recognized the District, not individual farmers, as the pre-1914 rights holder.  (See *Imperial Irrigation Dist. v. State Water Res. Control Bd.* (1986) 186 Cal.App.3d 1160, 1163, fn. 4.)  Amicus IVC seeks judicial notice of documents that purportedly reflect that Abatti and other landowners tried to file statements of diversion in 2006, and the State Board rejected them.  We decline to take judicial notice, because the materials are not necessary to address Abatti's argument regarding pre-1914 rights.

water user's asserted water needs are subordinate to the purpose of the District to serve all users. (See *Jenison*, *supra*, 149 Cal. at p. 504.)

Second, the superior court impliedly accepted Abatti's erroneous view that farmers have vested rights to receive the amounts of water that they have historically used to irrigate their crops, as evidenced by certain of its rulings, including that the District cannot transfer "perfected water rights" to other beneficiaries without consideration and that the District must use historical apportionment for farmers. In accepting this view, the court appears to have accorded undue significance to the appurtenant nature of the farmers' interests, including by failing to recognize that they hold appurtenant rights to water service only, and to the role that farmers played in perfecting the District's water rights—a role that the court twice notes. We discussed appurtenance and the present perfected rights *ante*. Further, pursuant to state law, under which the water rights originate, the farmers' rights are to water service, and not more. In addition, the District's present perfected rights are not based entirely on farming, but are based on municipal and industrial use, as well. (See *Arizona II*, *supra*, 376 U.S. at p. 341 [perfected rights are based on diversion of water to defined land area or to "definite municipal or industrial works"].)

In sum, the District has broad purposes and powers, and although the farmers possess an appurtenant right to water service, that right does not entitle farmers to a particular amount of water or to absolute priority over other non-domestic users with a right to service, and it does not limit the District's authority to satisfy its other obligations.

The extent to which the District balances these obligations implicates questions of discretion and policy, not rights. We address those questions next.[23]

C.      *The District's exercise of discretion*

The superior court determined that the 2013 EDP is unfair and/or inequitable because it prioritizes non-agricultural users over agricultural users and establishes straight line apportionment among agricultural users as the default method of apportionment, rather than a historical method. We conclude that the District did err in the manner in which it prioritizes users, although for reasons different from the superior court's. We further conclude that the District did not abuse its discretion in adopting the agricultural allocation.[24]

---

[23]     The California Supreme Court has noted the "pervasive powers" of the District specifically, albeit in a different context. (*Choudhry*, *supra*, 17 Cal.3d at pp. 663, 666 [holding that requirement that directors be landowners was unconstitutional as applied; describing the various powers of the Board, the District's supplying "all the water and electrical power needs of Imperial County" (and portions of other counties), and the residents' lack of alternatives, and noting that the District's "pervasive powers" are exercised over all residents, not just landowners].) As noted in the introduction, we express no view regarding the application of this opinion to other irrigation districts or their users. (See *id*. at p. 669 ["Imperial is singular among irrigation districts in that it has more residents, land and employees than the others."].)

[24]     To minimize confusion that might result from using "apportionment" in multiple contexts, we refer to the manner in which the 2013 EDP apportions water to agricultural users as the "agricultural allocation."

1.     *Additional background*

     a.     *The QSA and the Inadvertent Overrun Payback Policy*

The QSA capped the District's entitlement at 3.1 MAF.  The Inadvertent Overrun Payback Policy (IOPP), adopted in connection with the QSA, "provide[d] a mechanism for pay-back to the Colorado River system" from entitlement holders, due to "inadvertent overuse by [those] holders. . . ."  Payback had to be achieved through the implementation of "extraordinary conservation measures," i.e. those beyond normal beneficial and reasonable use, such as fallowing.  As we explain *post*, the District would eventually experience large overruns, subjecting it to these payback provisions.

     Under the IOPP, the maximum overrun account for entitlement holders, such as the District, was limited to 10 percent of the normal entitlement.  Water "ordered but . . . not diverted" was not included in the policy; the District understood the IOPP as not providing credit for underuse.  An entitlement holder with a payback obligation had to submit a plan to the federal Bureau of Reclamation (Reclamation) to "show how it will intentionally forbear use of Colorado River water by extraordinary conservation measures," such as fallowing.  If payback obligations were not on target for two consecutive years, Reclamation would begin enforcement proceedings and limit releases to that entitlement holder for the remainder of the year.

     b.     *Conservation efforts and equitable apportionment study*

Before we proceed to address the District's conservation efforts, we briefly describe how the District delivers water to farmers and municipal users.  For farmers, the "basic unit for the delivery of water . . . is the gate.  The lands served by a gate are

37

divided into fields and this division varies. Sometimes a single gate serves a single field; sometimes a single gate serves more than one field; and . . . this [may] change[] over time as the fields served by a gate are reorganized." For municipal users, the District generally provides raw water to water agencies, which treat the water and distribute it to users within their service areas.

To manage its obligations under the QSA and address potential overruns, the District began using fallowing programs, under which it paid farmers to remove fields from production. It later implemented efficiency-based conservation measures, through which it paid farmers to pursue on-farm conservation efforts. The programs used a 10-year water use history baseline. Fallowing required that each field have a water use delivery history, and that multiple fields/tenants at a gate have "verifiable water use records." The conservation program generally allowed for estimated baselines, but required that all fields at a gate participate (or have deliveries measured individually).

The District also began evaluating how to equitably distribute its limited water under the QSA. In December 2004, it retained Dr. Michael Hanemann and Mr. Bennett Brooks to "evaluate alternative methods for the equitable apportionment of water" when there was a "supply/demand imbalance (SDI) situation" (i.e., when "expected demand for water [was] likely to exceed the supply expected to be available to the District"). Hanemann and Brooks reviewed reports, considered other districts in California, and communicated with stakeholders.

Hanemann and Brooks provided their Draft Final Report to the District in August 2006. They explained that the District was "rather unique in California" in not allocating

38

water. It was also unique in having a "large amount of data," attributable to the fact that it had a "sophisticated computerized data system for recording how much water is delivered . . . ." They noted that the data were used "primarily for accounting and billing," and explained that there were "errors whereby deliveries to one field . . . are recorded as deliveries to another field in the same account," and that "while accurate at the account level, the data are not necessarily accurate at the field level."

For primary agricultural uses (field crops and vegetables), Hanemann and Brooks assessed the following methods of water apportionment: historical (soil group); historical (field history); historical (grower/farm unit); pure straight line; and transition from historical to straight line. Under soil group history, "each field would receive an allocation based on the historical average delivery of all fields with that soil type . . . ." Individual field history "allocates water to each individual field based on the specific history of water use per acre on that field over a baseline period of time." Grower history allocates water "to each individual water user or farming unit" based on their history of water use. Under straight line apportionment, "all fields are allocated the same amount of water per acre."

Hanemann and Brooks recommended against individual field or grower history, or pure straight line without any transition. They found that using individual field history

would not be practical, due to data gaps and errors.[25]  They also did not believe that it would be equitable, because there was "a large variation in field-level water use," much of which appeared to be attributable to farming practices rather than to soil, crop, irrigation method, or weather, which "undercut[] the notion that . . . individual field history is inherently fairer . . . ."  They elsewhere noted that if water use varied due to farming practice, then variations "reflect[ed] differences in the interests and skills of farmers and not necessarily differences in their needs per se."  They also found that using grower history would not be feasible, because there were not "sufficiently consistent record[s] . . . ."  The District's records, by account and gate, did "not necessarily correspond to farming units," and some fields were leased.  Hanemann and Brooks also had "serious concerns about the implementation and equity" of that method.

Hanemann and Brooks explained that they would "recommend either [straight line or soil group history] apportionment for an SDI situation."  They noted the similarity of the results of the two methods, but concluded that soil group was "likely to be a bit fairer because it recognizes the differences between soil types."  They made other recommendations, as well.  Specifically, they indicated that if straight line apportionment were adopted, there should be a "transition period . . . to allow time for adjustment"; it should be based initially on soil group; and it should last no more than 10 years.  For

---

[25]  Hanemann and Brooks found that of the 7,000 fields with deliveries since 1987, 2,000 did not have a consistent history and 20-30 percent of those with consistent deliveries "may have histories that are incomplete or questionable"—resulting in "as many as 3,000 or more fields with histories that are problematic . . . ."

40

either straight line or soil group, they recommended allowing "transfers among fields charged under the same account," which would provide flexibility. They also advised that the apportionment "need[ed] to be complemented by permitting internal exchanges of water within the District," again, to provide flexibility.[26]

Hanemann and Brooks also addressed apportionment to industrial and urban users in the event of an SDI. For industrial users, they recommended focusing on water use efficiency and District monitoring, and suggested that "the District should generally impose a smaller reduction . . . or possibly no reduction . . ." on such users. For urban users, they recommended apportionment per capita, by water agency, to account for development and density. They further recommended that the District consider conditions for the agencies, such as drought plans, and that if they met them, the "District should generally impose on them a smaller reduction . . . ."

      c.     *Adoption of the Equitable Distribution Plan and other efforts*

In 2006, the District's Board of Directors (Board) adopted a resolution for implementation of an equitable distribution plan for SDI conditions. The resolution explained that straight line apportionment would be used "based upon the ease of implementation and efficiency . . . ."

---

[26]    These recommendations pertain to field crops and vegetables, which comprise most water use. The experts recommended a different method for permanent crops (e.g. fruit trees). The District did not address permanent crops in the 2013 EDP, the parties do not focus on them in their briefing, and we do not address them.

41

The District proceeded to adopt the 2007 Equitable Distribution Plan. The "Apportionment of Supply" section of the plan apportioned water in an SDI in the following order: supply of last resort; municipal; industrial; feed lots, dairies, and fish farms; environmental resources water; and agriculture. Agricultural users would receive a straight line apportionment based on the available water supply, less the estimated demand of other users. The plan also provided for a District Water Exchange through which farmers could buy or sell water.

The District began developing an Integrated Water Resources Management Plan in 2008, and adopted a draft plan in 2009. It also began working with the county, cities, and community members to develop an Imperial Integrated Regional Water Management Plan, which the Board adopted in 2012.

The District revised the EDP in 2008 and 2009 "to address administrative issues and conceptual disparities . . . ." After the revisions, water would go first to municipal users, and the industrial apportionment required consideration of the Integrated Water Resources Management Plan for new contracts. In 2009, the district declared an SDI, but rescinded it before implementation.[27]

        d.     *Adoption of the 2013 Equitable Distribution Plan*

The District experienced large consecutive overruns in its use of water in 2011 and 2012 due to improved agricultural markets and continuing drought conditions. The

---

[27]    The District suggests that it is relevant that Abatti voted as a Board member to adopt prior EDPs. We disagree.

42

overruns cost the District $22 million to resolve. As a January 2013 water management policy document explained, payback under the IOPP was with conserved water. The District's primary method of water conservation was fallowing, for which costs had increased with the agricultural markets; conservation projects had even higher costs. The policy document concluded that "large-scale[] consecutive overruns" were "not financially manageable," and that the current EDP system was "backward-looking" and not sufficient for water management. The policy document also noted that Lake Mead's elevation had dropped, and that reservoir depletions could lead to accelerated payback or suspension of the IOPP.

In February 2013, the District's Water Conservation Committee recommended that the Board "provide for an annual system of apportionment to more effectively manage its Colorado River water supply . . . ." The Board accepted this recommendation.

The Board considered the revised, permanent EDP, with farmers remaining last in the apportionment order and receiving water by straight line apportionment, at a public Board of Directors meeting held in April 2013. Abatti submitted a letter to the Board at the meeting, raising concerns. Director Stephen Benson stated that it was "important that [they] just get started . . . . Whether it works or not, we're pretty sure that it won't work . . . I think we've all agreed on that. And we're . . . assuming . . . that there will be changes going forward." Benson believed that the straight line method was unfair to those with higher historical water use and that Abatti had raised valid arguments in his letter, but said that the District "just . . . need[ed] to move forward." Director James Hanks explained that the plan "had some major flaws," but that it was meant to get a

43

handle on the IOPP and send the message that the District was doing so. He did think straight line apportionment "kill[ed] the future on farm program [*sic*]"; put higher water users "at the mercy of . . . low water users"; and that the District had to move away from it. Director Bruce Kuhn suggested getting the plan "ratified under historical or . . . straight line," making sure "everybody knows . . . that it's flexible," and "down the road, if it looks like straight line is not making it, perhaps we can go historical." The Board adopted a revised EDP. The revised EDP provided for an annual apportionment, kept the same apportionment user order as in the earlier EDPs, i.e., with agricultural users last, and maintained straight line apportionment for agricultural users, together with the water exchange, which was in the form of an Agricultural Water Clearinghouse in the revised EDP.

The Board further revised the EDP in May 2013. Meetings with the Water Conservation Committee had continued, and it was "discussed that the EDP should not be limited to the straight line method . . . , but instead allow for other known methods . . . ." A "Method of Apportionment" section in the May 2013 EDP identified the various methods of agricultural apportionment and indicated that straight line would be used for the pilot program. The overall apportionment order was revised to place agriculture users second, after municipal users, and to reference the Method of Apportionment section.

In August 2013, Reclamation's regional director notified the District that it was at risk of exceeding its 2013 adjusted entitlement. He explained that if the District were to do so, Reclamation would be required under the IOPP to bring enforcement proceedings and limit 2014 releases.

At an October 2013 meeting, the Board discussed the agricultural apportionment method to be implemented for 2014. Members of the public addressed their concerns about the apportionment methods and process. The Board asked District staff to look into a hybrid method of apportionment.

At a meeting the following week, District staff presented its findings, and there were again public comments. The staff explained that different per-acre straight line apportionment levels would leave different reserve amounts. The Board approved a "50/50 percent hybrid agricultural apportionment with a historical use component . . . for calendar year 2014 consistent with the [EDP], with approximately 36,000 acre feet in the agricultural water clearinghouse as a reserve." A later District communication explained how the apportionment would be calculated, and the 2014 apportionment range (i.e., half of average use from 2003 to 2012, measured up to 10 acre feet, and excluding high and low years, plus 2.86 acre feet per eligible agricultural acre from the straight line component, up to a potential total of 7.86 acre feet).

The Board made a further revision to the EDP, which is not at issue here, resulting in the version challenged in this appeal (the 2013 EDP). The 2013 EDP provides that annual apportionment of the Available Water Supply would occur as follows:

> "a. Municipal Users - Base amount of 2006 usage plus current District wide average use per capita multiplied by the increase in population since 2006.

> "b. Industrial Users - For existing contracts, estimated based on past use, not to exceed contracted amount and contract terms. For new contracts, estimated based on anticipated use, not to exceed contract amount and contract terms, taking into consideration the Integrated Water Resources Management Plan.

45

"c. Feed Lots, Dairies, and Fish Farms - Estimated based upon past use and consideration of future changes.

"d. Environmental Resources Water - Estimated based upon the amount reasonably necessary to achieve the purposes of the District's commitments, taking past use into account.

"e. Agricultural Lands - Subtract the estimated demand for categories in Subsections (a) through (d) above from the Available Water Supply. Under a Straight Line Apportionment, divide the remaining Available Water Supply by the total number of Eligible Agricultural Acres to determine the Apportionment per Eligible Agricultural Acre. Under a different Method of Apportionment, the Apportionment will be calculated for Eligible Agricultural Acres based on that Method of Apportionment. . . ."[28]

The Method of Apportionment section provides:

"Apportionment models understood and discussed to date are historical, straight line, soil type, and hybrids of a combination of these methods. The default Method of Apportionment is Straight Line Apportionment, which may be changed for any Water Year prior to the notification period . . . herein at the discretion of the [Board]."

A separate section states that "[n]on-agricultural water users shall be allowed to use that amount of water needed for reasonable and beneficial use." Another section states in part that the Board "may terminate the implementation of an annual Apportionment at any time . . . ."

The plan provides for two types of transfers. First, it provides for a "farm unit," a "grouping designated by an Agricultural Water User of one or more water accounts

---

[28] The District uses the term Municipal Apportionment to describe the apportionment to non-agricultural users. This term does not appear in the 2013 EDP, and we elect to refer generally to user priority or apportionment order.

46

comprised of one or more fields leased or owned by the Agricultural Water User that can share the Apportionment for those fields." Second, it includes the Agricultural Water Clearinghouse for transfers between users.

Finally, the plan addresses overruns. The Available Water Supply is defined to exclude "any Water Management Reduction," which itself is defined as a reduction due to a "district wide overrun payback requirement[,] mandatory program, or regulatory limitation . . . ." The plan also provides for development of an Overrun Payback Program, in which "the cost of and/or responsibility for any District payback obligation will be borne" by the responsible users.

The District represents that the hybrid method was implemented from 2014 through 2017.

2. *User prioritization*

a. *Superior court ruling*

As noted *ante*, the superior court determined that the District is required to set equitable rules for water distribution. The court also determined that agricultural water users are among those to whom the no injury rule applies, and that the District could not "take perfected water rights from the present owner of the lands to which they are

appurtenant and transfer [them] . . . without appropriate consideration," citing *Bryant*.[29] The court also explained that Water Code section 106 prioritizes domestic and then irrigation use, and not other uses.

The superior court found that an equitable distribution plan could be structured to "ensure that every class of users has its water reduced equally . . . when demand exceeds supply," but that the 2013 EDP "prioritizes other groups of water users, in addition to domestic water users, over farmers." The court similarly noted that industrial contracts could subject water deliveries to proportionate reductions, but that the 2013 EDP does not place limits on deliveries under such contracts. The court then found that the 2013 EDP "allows water to be provided to new water users, such as new industrial and environmental users, which, in a period of shortfall, would disproportionately affect existing farmers," because water is apportioned to farmers last and thus, the amount of water that the farmers would receive would depend on the amounts received by other users.

The court concluded that the 2013 EDP is "not equitable because it disadvantages farmers, who should not be treated differently and with a lesser priority than other, non-

---

[29]    As discussed *post*, the no injury rule generally bars a change to the place or use of water if it injures a legal user. (*North Kern Water Storage Dist. v. Kern Delta Water Dist.* (2007) 147 Cal.App.4th 555, 559 (*North Kern*).) We will also discuss the superior court's finding under the "appurtenancy rule," which is not addressed in the case law and appears to refer to the trial court's acceptance of Abatti's argument that the appurtenant nature of the farmers' rights to water service precludes the District from modifying that service. This finding is unrelated to the superior court's earlier dismissal of Abatti's taking claim in his second amended petition, which we address *post*.

48

domestic, classes of water users," and that the District abused its discretion in adopting it. The court further concluded that because the "prioritization puts those other water users ahead of farmers, the 2013 EDP violates both the 'no injury' rule and the 'appurtenancy rule[,]' " and that the District "abused its discretion by violating such rules."

> b.    *The District abused its discretion in its prioritization of users*

The District is required to distribute water equitably to its users.  (See § 22252 [when charges are fixed, water "shall be distributed equitably as determined by the board"].)  This is consistent with the District's public purpose.  (*Allen*, *supra*, 101 Cal.App.2d at p. 467; cf. *Leavitt v. Lassen Irrigation Co.* (1909) 157 Cal. 82, 90 (*Leavitt*) [water suppliers acting in public capacity "must supply all alike who are like situated"].) At the same time, the District must distribute water consistent with its purposes and obligations, which could potentially warrant using different distribution methods for different user groups.  (See *Jenison*, *supra*, 149 Cal. at p. 503 [water use must be "in consonance with and in furtherance" of the trust's purpose]; Cal. Const., art. X, sec. 2 [requiring conservation, and limiting use to that reasonably required].)  However, in order to fall within the bounds of the District's discretion, such distinctions must be reasonable.

The 2013 EDP provides for all other water users to receive water before agricultural users, with few, if any, meaningful limitations on the amounts of water those other water users are permitted to use, beyond requiring reasonable and beneficial use, and utilizing factors such as past use and subsequent changes.  Although the plan includes District discretion to modify the agricultural apportionment *method*, there does not appear to be a similar provision for the apportionment prioritization *order*.  Thus, in a

49

shortage situation, it is the farmers who would bear the impact—with potentially little District flexibility to provide them any relief. Further, the District had resources with which it could have assessed potentially robust limitations on other users, including the expert report discussion of industrial and municipal users, but did not include such limits in the 2013 EDP.

It was not reasonable for the District to adopt a permanent, annual apportionment that applies few, if any, limits on most categories of users and effectively places the burden of shortages almost entirely on farmers. The District must treat all categories of users equitably under the plan, consistent with the interests of the users, the District's purposes, and California water policy. As long as the District satisfies these obligations, it is not required to carry out its apportionment in any particular manner, and the superior court erred to the extent that it directed the District to do so.

We now turn to the District's arguments, and begin with one that we agree with, in part. The District argues that its apportionment "helps to prevent unsustainable overruns and promotes water conservation . . . ." Abatti contends that the 2013 EDP is unnecessary and actually undermines the District's water rights. We conclude that the District could have reasonably determined that a permanent EDP is necessary.

Beginning in 2003, the District was subject to a 3.1 MAF cap under the QSA, and payback procedures under the IOPP. In response, the District took steps to address water management: it implemented fallowing programs and, later, efficiency-based conservation measures; retained experts; adopted and revised the EDP; and developed water management plans. Yet, there were still overruns, including the consecutive

50

overruns in 2011 and 2012, which cost the District $22 million. In 2013, Reclamation notified the District that the District was in danger of another overrun, which could result in enforcement proceedings and reduced deliveries. The experts had found that the District was "rather unique" in not allocating water. Even the directors who had concerns about the agricultural allocation in the 2013 EDP indicated that it was important to take action.

Abatti's argument that the 2013 EDP is unnecessary lacks force. He points out that the District did not have an EDP for over 100 years; that there had been only two overruns, which were repaid via conservation (suggesting that the cost figure was misleading); and that those overruns were due to market conditions and drought. While it is true that there was no EDP prior to 2003, events beginning at that time necessitated action by the District; the conservation programs used to repay overruns cost the District a significant amount of money to operate; and further market changes and droughts were not merely possible, but the District actually faced another overrun in 2013.[30] Abatti then argues that the IOPP was working as "designed," by providing flexibility to pay back overruns later. This argument minimizes the costs, and also ignores the consequences, of successive overruns. Finally, Abatti contends that the 2013 EDP causes a "forced reduction" of water use by farmers, that an appropriator's "water rights . . . are

---

[30]     Abatti also contends that the District "underused 800,000 AF of water . . . worth hundreds of millions of dollars . . . ." He does not dispute the District's view that underuse is not counted under the IOPP, nor does he contend that underruns in some years prevent overruns in others.

lost by a sustained period of five years of non-use" under sections 1240 and 1241, and that the District risks losing its rights by reducing the amount of water used by farmers. The authority that Abatti cites in support of these contentions pertains to forfeiture of pre-1914 rights and is inapposite (*Millview County Water Dist. v. State Water Resources Control Bd.* (2014) 229 Cal.App.4th 879, 891), and he provides no statutory analysis. We deem the point forfeited, other than to note that Abatti is essentially ignoring the existence of the clearinghouse, as he does in other arguments that we discuss, *post*. Further, amicus IVC contends that the District is exempt from reversion of its water rights based on non-use.[31]

Turning to the District's defense of the overall apportionment in the 2013 EDP, the District begins by contending that 97 percent of its water is delivered to farmers. There is no dispute that farmers receive the vast majority of the water that the District distributes, but that does not diminish their entitlement to equitable distribution. Further, other sources, including the water management plans, reflect anticipated growth of non-agricultural water use by 2050.

---

[31] IVC cites section 1005, which provides that "[a]ny right to the water of any stream which flows along a boundary of the State and which is the subject of an interstate compact to which the State is a party . . . , shall not be subject to any . . . limitation provided by law . . . relating to the continuity of use of such water." The District's permit references section 1005. Abatti also contends that the overrun issue was a "smokescreen" to deprive farmers and favor new, geothermal users, in connection with Board financial interests. He relies on documents purportedly reflecting campaign contributions and individuals moving between the District and geothermal companies, for which he requests judicial notice. We decline to consider these speculative allegations, and deny the request, because these materials are not properly subject to judicial notice. (*Rowland*, *supra*, 4 Cal.4th at p. 268, fn. 6.).

The District next contends that different categories of users are subject to different laws and contracts, and the 2013 EDP subjects each group to "specifically tailored" limitations. It also denies that the 2013 EDP prioritizes other categories of users over farmers or that farmers bear the burden of shortages. The District's denials are not persuasive. The provisions for non-agricultural users account for population increases and other future changes—leaving few if any meaningful limitations on the amounts of water those users may receive, other than a requirement that their use be reasonable and beneficial. The District seems to assume that non-agricultural demand will be reduced going forward. However, the evidence does not necessarily support this assumption. Further, even if this were correct, that would not change the fact that the only users whose use is actually limited under the EDP are farmers. We now turn to the apportionment for each group in the 2013 EDP, addressing demand as applicable.

Municipal users receive a "[b]ase amount of 2006 usage plus current District-wide average use per capita multiplied by the increase in population since 2006," under the 2013 EDP. Although this provision uses a 2006 baseline, it also accounts for current average use, albeit across the District, and for population growth. We are not persuaded by the District's argument that per capita municipal consumption will decline based on laws inapplicable to farmers. In making this argument, the District relies on, among other things, the governor's target of reducing urban consumption 20 percent by 2020, which is also reflected in the Water Conservation Act of 2009. (Exec. Order B-37-16; § 10608.16 (Stats. 2009-2010, 7th Ex. Sess., ch. 4, § 1).). But the governor's executive order and the Act also address agriculture, and the Water Management Plans in the record

53

reflect that municipal demand will continue to increase through 2050. (Exec. Order B-37-16 [addressing urban and agricultural water management, including requiring agricultural water management plans for more water suppliers and ensuring that plans "identify and quantify measures to increase water efficiency and . . . adequately plan for periods of limited water supply"]; § 10608.4 [legislative intent to, among other things, "[e]stablish consistent water use efficiency planning and implementation standards for urban water suppliers and agricultural water suppliers"]; § 10608.48 [agricultural water management measures].)[32] Further, and significantly, regardless of whether municipal use increases or decreases in the future, the municipal apportionment provision still provides for water sufficient to meet that use.

Industrial users receive water "estimated based on past use not to exceed contracted amount and contract terms." For new contracts, water use is "estimated based on anticipated use not to exceed contract amount and contract terms taking into consideration the Integrated Water Resources Management Plan." Assuming that the existing contracts contain both limits on use and barriers to modification, as the District contends, and for which evidence exists, it is not the EDP that imposed those use limits. This also does not establish that the 2013 EDP imposes meaningful usage limits on new

[32]     The District cites the executive order, but the order does not appear to be in the record. We take judicial notice of the order on our own motion. (Evid. Code, §§ 452, 459; last accessed at https://www.ca.gov/archive/gov39/wp-content/uploads/2017/09/5.9.16_Attested_Drought_Order.pdf). As for evidence of growth, we do not consider the chart attached to Abatti's initial brief and rely on the record.

54

contracts. The District contends that it has "implemented additional safeguards," citing language in the EDP regarding anticipated use and the Integrated Water Resources Management Plan, and maintains that it is "looking to best management practices under the state Water Conservation Act to set target reductions . . . ." The water management plans do reflect targets for reducing industrial use, but they also reflect anticipated increases in demand through 2050 (even with assumed reductions). Further, nothing in the 2013 EDP requires the District to set target reductions for industrial users, and it identifies no evidence demonstrating that it has.[33]

Feed lots, dairies, and fish farms are apportioned water "[e]stimated based upon past use and consideration of future changes." This "consideration of future changes" accounts for changes in demand that might occur. The District contends that these users "communicated the importance of treating this category differently," citing 2009 hearing input and the unique issues associated with raising live animals. The issue is not that the District treats live animal farmers differently from farmers who grow crops; rather, the issue is that the District imposes no real limitations on live animal farmers' water use.

The remaining category, "Environmental Resources Water," receives water under the EDP "based upon the amount reasonably necessary to achieve the purposes of the

_____

[33]  We address two related arguments that the parties raise. The District argues that industrial contracts provide "stability . . . necessary to get funding for these uses . . . ." That contracts are needed to get project funding is unsurprising, but that does not mean that the projects themselves are necessary or that their water requirements are justified. Abatti contends that "use of fresh inland water . . . for geothermal cooling . . . violates the State Board's Resolution No. 75-58," adopted in 1975. He does not elaborate and we do not consider the contention further.

District's commitments, taking past use into account." The District contends that this category is "extremely limited" to allow it to "meet current and future environmental legal obligations . . . ." However, the fact remains that there is no limitation placed on this category of user.

We now turn to Abatti's arguments. Although Abatti agrees with the superior court that the District abused its discretion in prioritizing other categories of users over farmers, he makes a number of assertions regarding the Water Code in this regard, some of which are erroneous. Abatti begins by citing statutes pertaining to irrigation district watermasters and irrigation procedures to contend that statutory provisions other than section 22252 reflect that a district "may not disregard Farmers' pre-existing water rights in favor of distribution to other users without such rights." Abatti misapprehends the import of these statutes.

The provisions concerning districts with watermasters are simply inapposite; the District states that it has never participated in the watermaster program to which the provisions apply. (See, e.g., § 22080, et. seq.)

Abatti contends that under the irrigation procedures codified in sections 22252.1 and 22252.3, "with respect to any expected shortage . . . , the [District] must provide notice and take into account the Farmers' beneficial needs . . . ." We are not persuaded. Sections 22252.1 and 22252.3 are discretionary and do not support his point.

Section 22252.1 provides that a district board "may specify" a water application deadline for the upcoming irrigation season (which remains fixed unless the board provides compliant notice of a change), and "may . . . give preference" to timely

applications or lands not requiring an application. Section 22252.1 further provides that "[n]othing in this section shall prohibit apportionment of available water to land given preference under this section or otherwise restrict or limit existing powers of the board to control and provide for distribution of water." Section 22252.3 states, in pertinent part, that in years when a district board determines that water supplies "will be inadequate to provide water in a quantity furnished in years of average precipitation," it "may specify" a water application date for the next irrigation season. It again states that "[n]othing in this section shall prohibit or limit the apportionment of available water to land given preference under Section 22252.1 or this section or to otherwise restrict or limit existing powers of the district to control and provide for distribution of water."

Both sections use the term "may," not "shall" or "must," and both confirm that they place no limitation on a district's power to control water distribution. Thus, these statutory provisions permit, but do not require, compliance with their irrigation application procedures. Abatti disagrees, citing *State Water Resources Control Board Cases* (2006) 136 Cal.App.4th 674 (*SWRCB*) to support his contention that the term "may" must "be construed as mandatory where the 'public interest or private right requires that a thing should be done.' " But *SWRCB* was talking about the State Board itself, and found the power at issue to be of public interest. (*Id*. at p. 687 [addressing various State Board decisions]; *id*. at pp. 731-732 [§§ 1257 and 1258 specified factors for applications to appropriate water and permitted State Board to subject appropriations to conditions necessary for water control plans; explaining that the power to impose such conditions was "undoubtedly . . . to be exercised for the public at large" and thus

57

mandatory].) Abatti does not establish that requiring districts to follow certain application procedures for one set of users is a matter of public interest, particularly in view of the fact that the statutes make clear that districts retain discretion over water distribution.[34]

Finally, Abatti contends that the 2013 EDP violates Water Code section 106, and the superior court's finding that it does so constitutes an independent basis for affirmance. The District contends that the 2013 EDP is consistent with section 106, based on, among other things, the fact that most of the District's water goes to farmers, and its need to balance competing policy considerations. Having already concluded that the District abused its discretion in its user prioritization, we need not resolve whether section 106 is an alternative basis for affirmance on that issue.

However, we do have doubts that the 2013 EDP is consistent with this section. Section 106 expresses a clear policy preference for domestic and then irrigation use, providing, "It is hereby declared to be the established policy of this State that the use of water for domestic purposes is the highest use of water and that the next highest use is for irrigation." The 2013 EDP effectively prioritizes all other users over farmers, not only

---

[34] We reject two other points that Abatti raises. He contends that these provisions demonstrate that the legislature intended for water to be "limited to Farmers in times of shortage," not permanently. Abatti provides no statutory analysis to support this assertion, and this interpretation would be contrary to the permissive nature of the statutes and their preservation of District discretion. He also contends that "the notice provisions in the earlier SDI EDPs [are] a tacit admission" that allocations during shortages are subject to section 22252.3. Previous EDPs provided for notices to farmers with their apportionment, not an application system as envisioned under section 22252.3.

58

domestic users.  It is true, as the District observes, that other policies apply to the District as well, including conservation.  (See § 107 ["The declaration of the policy of the State in this chapter is not exclusive, and all other or further declarations of policy in this code shall be given their full force and effect"]; e.g., § 100 [requiring that water be put to reasonable and beneficial use, and that conservation be exercised in view of such use].)  Nevertheless, the District must exercise its discretion to distribute water under section 22252 consistent with *all* of these policies—including section 106.[35]

     c.     *The District did not violate the no injury rule or appurtenancy*

     i.     *No injury rule*

The no injury rule arises from the common law principle that an owner of water rights "has the right to change the purpose and place of use of . . . water, so long as any change does not injure others with rights in the watercourse."  (*North Kern*, *supra*, 147 Cal.App.4th at p. 559; *SWRCB*, *supra*, 136 Cal.App.4th at pp. 739-740 [discussing common law sources for no injury rule].)  This rule was incorporated into the Water

---

[35]    We address one final point here.  The superior court found that the 2013 EDP "allows water to be provided to new water users," to the detriment of farmers in shortages.  The court appears to have assumed that the District has control over new residential or commercial development within its service area, or at least the authority to deny water to such new users.  We question these assumptions, and to the contrary, surmise that new development may entail review and decisionmaking by multiple entities, as we see in California Environmental Quality Act cases.  New users then become part of the public served by the District, consistent with its obligations to manage and distribute water equitably.  (See *Leavitt*, *supra*, 157 Cal. at p. 90 ["[a]ll who enter the class may demand the use of the water"]; *Butte County Water Users' Ass'n v. Rr. Comm'n of Cal.* (1921) 185 Cal. 218, 230 [company supplying water for irrigation "has not the power to take on new consumers without limit" and the matter is "one of judgment"].)

59

Code.  (§ 1700, et seq.)  A permittee holding appropriative water rights "may change the point of diversion, place of use, or purpose of use," subject to requirements that include Board permission.  (§ 1701.)  "Before permission . . . is granted the petitioner shall establish, to the satisfaction of the board, and it shall find, that the change will not operate to the injury of any legal user of the water involved."  (§ 1702; see also § 1706 [other appropriators (e.g., pre-1914 rights holders) "may change the point of diversion, place of use, or purpose of use if others are not injured by such change"]; §§ 1725, 1736 [addressing water transfers].)  The no injury rule applies to all legal users of water, not just traditional rights holders, but its application in a particular situation depends on the effect of the changes at issue on the users' rights.  (*SWRCB*, at pp. 743, 800.)

The superior court found that the "District's agricultural water users are among the class of legal water users to which the 'no injury' rule applies," and that the 2013 EDP violates the rule, "[b]ecause [its] prioritization puts [new water users] ahead of farmers . . . ."  We disagree.  The no injury rule applies only to changes to the point of diversion or place or purpose of use—not to modifications to water service—and therefore does not apply here.  The farmers are legal users, but their right is to water service; the District conduct at issue is the implementation of the 2013 EDP, which modifies that service.  Further, this case does not involve an attempt to change the District's permit, such that § 1702 would apply.  (*SWRCB*, *supra*, 136 Cal.App.4th at p. 753.)

Abatti's arguments for application of the no injury rule lack merit.  He argues that farmers can assert injury because they hold pre-1914 water rights, the District's permit is

60

subject to "vested rights," and, under its permit, the District would have "no power to transfer . . . water" other than for the original irrigation and domestic purposes and would have to comply with the no injury rule to add industrial use. (§ 1381 [water use is limited "to the extent and for the purpose allowed in the permit"]; § 1700 [purpose may be changed pursuant to statute]; § 1701.2 [permit holder must demonstrate reasonable likelihood of no injury to legal user].)

As an initial matter, we reject Abatti's characterization of apportionment as a "transfer" of water or water rights, and his similar use of "redistribut[ion]" elsewhere. As discussed above, the farmers' rights are to service; implementing an apportionment plan does not shift water rights, but rather, modifies the service. The arguments themselves lack merit, as well. Abatti has not established that the farmers hold pre-1914 rights and regardless, the key issue here is not whether the farmers are legal users; it is that there is no relevant injury since, as noted, there was no change to the point of diversion or place or purpose of use and thus, the no injury rule is not implicated. As for the District's permit, not only is the conduct at issue the adoption of an equitable apportionment plan, rather than a permit change application, but uses beyond domestic and irrigation were already in place at the time of the adoption of the 2013 EDP. Municipal use was added to the District's permit in or after 2002, and contracts in the record reflect that the District had been supplying water to industrial users for decades. If that industrial use constituted

a change in use for purposes of the no injury rule, it arguably occurred when those contracts went into effect—not in the 2013 EDP.[36]

### ii. *Appurtenancy*

As discussed *ante*, landowners possess a right to water service that is appurtenant to their lands. (*Bryant*, *supra*, 447 U.S. at p. 371, fn. 23.) The District objects to the superior court's determination that, under *Bryant*, the District could not "take perfected water rights from the present owner of the lands to which they are appurtenant and transfer [them] . . . without appropriate consideration." We agree that this reasoning, and the superior court's finding that the District violated the "appurtenancy rule," are in error.

Neither the superior court nor the parties have identified any authority for this "appurtenancy rule." We infer that the court was referring to its finding that the District may not modify service to users with appurtenant rights, to provide service to others who do not possess such rights, which is how Abatti used the term in his proposed statement of decision. Whatever the terminology, we disagree. First, this conclusion relies on viewing apportionment as a transfer, which we rejected *ante*. Second, although *Bryant* recognized that landowners are equitable and beneficial owners of the District's water rights, with an appurtenant right to service (*Bryant*, *supra*, 447 U.S. at pp. 371, fn. 23), it

---

[36] The District relies on federal law and California regulations to contend that domestic use encompasses industry; Abatti disagrees, citing the permit's lack of industrial use coverage. (See *Arizona I*, *supra*, 373 U.S. at p. 566 [Project Act incorporates 1922 Compact definitions]; 1922 Compact [defining domestic use to include municipal, industrial, and more]; Cal. Code Regs., tit. 23, § 663 [municipal use includes "use incidental thereto"].) Because the 2013 EDP did not effect a change in use, we need not resolve this issue.

did not make the ruling described by the superior court. Abatti contends that, in *Bryant*, the Ninth Circuit had found that redistribution of water deliveries among landowners would be permissible and that the Supreme Court stated that such a redistribution " 'would go far toward emasculating the substance, under state law, of the water right decreed to the District.' " In making this observation, the Supreme Court was discussing the Reclamation Act cap generally, not redistribution specifically; elsewhere, the *Bryant* Court declined to find that landowners were entitled to particular amounts of water. (*Bryant*, at p. 371.) Further, and more importantly, *Bryant* had no reason to address whether the *District* could modify deliveries to those with appurtenant rights to service, much less whether such modification would require consideration.[37]

3. *Agricultural allocation*

a. *Superior court hearing and ruling*

At the hearing on Abatti's petition, the superior court inquired about gate history. District counsel stated that the District possessed gate history for the past 30 years, but not field history, and "on any single gate you can have multiple fields which are farmed by multiple different farms." The court responded that "the great majority . . . have a single gate for a single field unit," and although some did not, "at least it will give you a

---

[37] As noted *ante*, the *Bryant* Court was not even considering equitable distribution under § 22252; as noted *ante,* it described apportionment as taking place under § 22250, an assessment approach no longer in use by the District. (*Bryant*, at p. 371, fn. 23.) We also reject Abatti's contention that the District forfeited its argument regarding the superior court's appurtenancy rule finding by not raising it in its opening brief. The ruling turned on the court's reasoning regarding appurtenant rights, which the District did challenge.

history for that gate and then you can . . . address the delivery to that area, something that can be figured out." District counsel explained that they "had a lot of difficulty . . . figuring out field history . . . prior to QSA, when [they] started implementing [their] fallowing program," and that "many – probably the majority [of gates] – do have multiple fields . . . ."[38]

The superior court concluded in its Statement of Decision that the 2013 EDP is unfair and/or inequitable due in part to the agricultural allocation. The court determined that "[t]o apportion irrigation water equitably, an irrigation district must examine the irrigated land, considering the soil type and crops grown," citing *Tehachapi-Cummings County Water District v. Armstrong* (1975) 49 Cal.App.3d 992, 1001-02 (*Tehachapi*) and *Simon Newman Co. v. Sanches* (1945) 69 Cal.App.2d 432, 438 (*Simon Newman*).

The superior court found that "different parcels of farmland require different amounts of water," due to soil type and conditions, crop water requirements, and decisions to grow different crops at different times of year. The court elaborated:

> "[A]pportioning water among farmers using average historical use data measured at field [g]ates over a 25 to 30 year period would take into account such variables, including soil type, crop selection and rotation, and single and double cropping, would minimize any disadvantage to farmers who have invested in on-farm conservation

---

38    The superior court disagreed with the District's counsel, explaining that the court was "quite familiar with the Valley and [its] irrigation system" and had "driven from one end to the other numerous times." The court later acknowledged that there were a "considerable number" of gates that serviced multiple fields, but stated that the "problem arises if . . . it's the same gate servicing two different farmers" and "[t]here's probably not a lot of those . . . ."

64

measures and would resolve all of [Abatti's] objections to the 2013 EDP's measures for apportionment among farmers."

The court stated that the District "has records of historical water usage on farmland, measures at the gate to each field, dating back to 1987, based on the acknowledgement of such by counsel for [the District] at the hearing."

Next, the court found that the District's use of straight line apportionment was "not equitable," because "standing alone, it potentially allocates more water to some users than they need, increasing the potential for waste, and concomitantly risks shorting other farmers who need higher volumes of water because of soil type and/or crop requirements." The court further found that "[t]o the extent it encourages waste, straight-line apportionment violates Article X, Section 2 of the California Constitution."

Finally, the court indicated that Board directors "recognized that historical use was a better basis" for apportionment and that "one reason [the District] resorted to the straight-line method was ease of implementation and administration by staff." The court also viewed the District's implementation of the hybrid method, after specifying straight line as the default method, as "an acknowledgement of the inappropriateness" of straight-line apportionment.

### b. *The District did not abuse its discretion in its agricultural allocation*

The superior court's ruling is flawed in several respects, including its failure to assess the agricultural allocation actually adopted in the 2013 EDP. After addressing these flaws, we review the agricultural allocation adopted in the 2013 EDP and conclude that the District did not abuse its discretion.

65

First, the court did not address all of the components of the agricultural allocation contained in the EDP. The court found that the straight line method, "standing alone," would potentially lead to water shortages and unconstitutional waste. The court also found that the District's implementation of the hybrid method for calendar year 2014 reflected that straight line apportionment was inappropriate. But the court did not account for the Method of Apportionment section of the 2013 EDP, which sets forth multiple different methods of apportionment and permits the District to change the method each year; that the EDP allows for sharing among farm units; and that the EDP establishes a water clearinghouse for sharing among users.[39]

Second, the court erred in determining that equitable distribution requires an irrigation district to "consider[] the soil type and crops grown," and that using "average historical use data measured at field [g]ates over a 25 to 30 year period" would take into account such variables. The court also found that utilizing historical use would "resolve all of [Abatti's] objections to the 2013 EDP's measures for apportionment among farmers." In making these findings, the court appeared to find, at least impliedly, that a particular historical approach is the only reasonable method of apportionment. However, the issue is whether the District acted within its discretion in selecting the agricultural allocation that it did, *not* whether a different type of apportionment would be better— much less whether the apportionment selected would satisfy Abatti's personal concerns.

_____

[39]    Further, the fact that straight line apportionment remained an option meant that the District presumably had not found the method to be inappropriate.

(See *Carrancho*, *supra*, 111 Cal.App.4th at p. 1268 [traditional mandamus may not be used to "force the exercise of discretion in a particular manner or to reach a particular result"]; *Klajic v. Castaic Lake Water Agency* (2001) 90 Cal.App.4th 987, 995 [" 'In determining whether an agency has abused its discretion, the court may not substitute its judgment for that of the agency' "].)  Even if one could conceive of a situation in which only one particular action on the part of an agency could be reasonable, the court's legal and factual findings do not support such a conclusion here.

The cases cited by the superior court, *Tehachapi* and *Simon Newman*, do not address equitable distribution, and, contrary to the superior court's suggestion, do not require that a historical approach to apportionment be used.  If anything, those cases make clear that past use and current need are not synonymous.  *Tehachapi* reversed a judgment adjudicating groundwater rights, explaining that an overlying owner's share "is predicated not on his past use . . . but solely on his current reasonable and beneficial need . . . ."  (*Tehachapi*, *supra*, 49 Cal.App.3d at pp. 996, 1000-1001.)  The court explained that when "there is insufficient water for the current reasonable needs of all the overlying owners, many factors are to be considered in determining each owner's proportionate share," such as soil character.  (*Id*. at pp. 1001-1002.)  The *Tehachapi* court did not hold that any particular factor must be considered, much less that focusing on past use is the only appropriate way to take into account pertinent factors.  *Simon Newman* reversed a judgment apportioning water by acreage to owners of parcels that had been part of a tract serviced by a ditch.  (*Simon Newman*, *supra*, 69 Cal.App.2d at p. 434; see *id*. at p. 440 [where open ditch irrigates tract, sold parcels may benefit by "implied

67

easement . . . for necessary, correlative irrigation purposes"].)  The *Simon Newman* court explained that if apportionment is based on acreage, rather than need, the apportionment plan should consider use or "may not be deemed to be equitable"—thus supporting a focus on need or use.[40]

Third, the superior court's factual findings lack support.  The court found that "different parcels of farmland require different amounts of water," due to soil type, crop water requirements, and decisions about crop type and time of planting, and that field history would take such factors into account.  The expert report by Hanemann and Brooks found that variation in water use was more likely due to farming practices rather than factors such as soil or crop type—meaning that even if apportionment based on field history would account for those practices, it would not necessarily be equitable.  The court also found that apportioning based on field history would "minimize any disadvantage to those who had used on-farm conservation."  To the contrary, using field history could force those who had conserved to continue doing so, while giving those who had not conserved no reason to start.

---

[40]   *Simon Newman's* explanation is somewhat opaque, but we believe we capture the gist of it:  "It is apparent that an apportionment of water based solely on the relative number of acres of land which each owner possesses, without determining the quantity of water necessary for use on any parcel or portion thereof should depend upon an accurate estimate of the actual number of acres in each parcel subject to similar irrigation and that all of the land in each tract is susceptible of producing the same variety of crops, or that it may reasonably be used for similar purposes."  (*Simon Newman*, *supra*, 69 Cal.App.2d at 438.)  To the extent that *Simon Newman* calls into question pure straight line apportionment, that is not the agricultural allocation adopted by the District in the 2013 EDP.

Finally, the record does not support the superior court's finding that the District "has records of historical water usage on farmland, measures at the gate to each field, dating back to 1987, based on the acknowledgement of such by counsel . . . ."  The expert report reflected that although the District had water delivery data, it was "not necessarily accurate" at the field level and that as many as 3,000 fields (of the 7,000 with deliveries since 1987) either lacked, or had questionable, histories.  Indeed, the report recommended against using field history in part because of the inadequacy of the data.  In addition, contrary to the court's assertion, District counsel did not acknowledge that the District has 25-30 years of field history.  Rather, counsel indicated that the District has *gate* history; that most gates served multiple fields; and that the District has potentially better information only from 2003 forward, when the District implemented its fallowing policy. It was the court that suggested that field history was available, stating that the court was familiar with the region and that most gates served a single field, or fields owned by a single farm.  The court's personal experience is not evidence.  (Cf. *United States v. Berber-Tinoco* (9th Cir. 2007) 510 F.3d 1083, 1091 [judge may not rely on personal experience to take judicial notice].)[41]  Thus, while the record reflects that the District had

_____

[41]     For similar reasons, we reject the superior court's reliance on certain Board members' purported recognition that historical use would be a better method of apportionment than straight line.  The issue is whether the agricultural allocation that the District selected was within its discretion, not whether individual directors may have preferred a different agricultural allocation.

at least some recent field data, it does not support the court's finding that it had more than 25 years' worth.[42]

We now turn to the agricultural allocation that the District actually adopted in the EDP, and conclude that the District did not abuse its discretion in selecting it. We have already determined that the District reasonably found it necessary to adopt a permanent EDP to address its water management issues. The District could further have reasonably found that the agricultural allocation in the 2013 EDP, which gives the Board discretion to choose among apportionment methods and provides flexibility through farm unit sharing and the clearinghouse, addressed those issues by permitting farmers to meet their needs while encouraging them to conserve. This determination is reasonable and supported by the record.

With respect to the default straight line apportionment method, although the experts recommended using a soil group history method, or transitioning from soil group to straight line, they found that the two methods were similar and that pure straight line could eventually be used. Further, the District retained discretion to use soil group, historical, or hybrid methods and to modify them. The clearinghouse and intra-farm

---

[42]   Abatti cites fallowing and conservation program materials, as well as other documents, as further evidence that the District possesses historical field data. Those programs do use 10-year historical baselines, although fallowing appeared to require that participants with multiple fields at a gate have water use records, implying some still might not have them, and could not participate. Reliance on the other materials, such as the QSA (which does not address historical use) and a federal register digest regarding the IOPP (which focuses on District-wide overruns), appears misplaced.

70

sharing were also consistent with the experts' recommendations and could ensure flexibility. Farmers who received more water than they needed could use the clearinghouse to sell it, thereby avoiding waste. Those who received less water than they needed could purchase more from the clearinghouse. Finally, by implementing a hybrid method with a 10-year historical component in 2014, the District demonstrated that the 2013 EDP was sufficiently flexible to account for the experts' caution about moving directly to a straight line method of apportionment, the inadequacy of the older field data, and the input from the public, which had raised concerns about both the historical and straight line methods. The District also set the straight line component of the hybrid apportionment at a level that created a reserve in the clearinghouse, ensuring that water would be available there.[43]

Abatti's arguments lack force. We have rejected his contention that the 2013 EDP is unnecessary. He also contends that an equitable allocation must take into account the existing users' "entitlement to reasonable use of water," and that the superior court correctly concluded that straight line apportionment does not do so. We reject this contention, as well. Reasonable use is a limiting principle, not a basis for finding entitlement to a particular amount of water. Further, the contention disregards other

_____

[43]    The District also cites evidence demonstrating that other irrigation districts use straight line apportionment and that the method is the "most common" method used in "other parts of California and in several other western states." Abatti contends that "[m]any of those districts have alternative sources of water . . . ." While that may be true, use of the method elsewhere does suggest that it does not necessarily lead to shortages and waste.

71

components of the EDP, and their role in getting water to those who need it, such as the water clearinghouse.

Abatti's reliance on *City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224 is misplaced. In that case, the superior court entered a judgment in a water dispute without regard to existing overlying and riparian rights, and found it unnecessary to adjudicate individual rights, due in part to its view that the solution that the court had arrived at was consistent with reasonable use. (*Id*. at pp. 1237-1238.) On review, the Supreme Court held that the superior court could not "disregard legal water rights in order to apportion on an equitable basis water rights to all producers in an overdrafted groundwater basin." (*Id*. at pp. 1239-1240; *id*. at p. 1248 ["we have never endorsed a pure equitable apportionment that completely disregards . . . owners' existing rights"].) In this case, no overlying or riparian rights were at issue; rather, the District was apportioning water among users with a right to service, not among holders of different water rights.[44]

---

44    Abatti cites several other cases. We addressed *Tehachapi* and *Simon Newman*, *ante*. The remaining cases do not involve equitable distribution, address different rights holders, or are otherwise inapposite. (See, e.g., *Katz v. Walkinshaw* (1903) 141 Cal. 116, 133-136, 141 [overlying owners had correlative rights in common supply of groundwater, and were entitled to reasonable use]; *Rancho Santa Margarita v. Vail* (1938) 11 Cal.2d 501, 518-519 [superior court erred by enjoining water use among riparians based on extent of ownership, rather than current needs and uses]; *El Dorado Irr. Dist. v. State Water Resources Control Bd.* (2006) 142 Cal.App.4th 937, 942-943, 965-967 [affirming writ of mandate requiring removal of permit condition that did not apply to later appropriators; reasonable use and public trust doctrines were primary, but no interest there justified subverting priority].)

Finally, Abatti contends that there is substantial evidence to support the superior court's finding that straight line apportionment encourages waste, in violation of the state constitution. We have already concluded that the superior court's reasoning is flawed in this regard; although the court focuses on the default straight line apportionment method, the agricultural allocation gives the Board discretion to select among multiple apportionment methods and the EDP also includes sharing within farm units and a clearinghouse. Abatti's specific arguments here are no more persuasive. He first cites *Willard v. Glenn-Colusa Irrigation Dist.* (1927) 201 Cal. 726 to suggest that straight line apportionment is inequitable. In that case, the California Supreme Court held that irrigation districts may charge rates in lieu of assessments, and noted potential issues with assessment systems. (*Id*. at p. 744; *id*. at pp. 742-743 [gap between land value and water need could lead to waste and uncertainty, because owners would not be obligated to sell excess water].) *Willard* was not addressing an equitable apportionment plan, much less one that allows for implementation of different apportionment methods and includes a clearinghouse. Abatti also cites charts used by District staff to present their apportionment method findings at one of the October 2013 hearings. One chart shows average historical use by acre over a 10-year period, and the other shows water amounts that would be used under different apportionment methods. Not surprisingly, these charts reflect that if initial apportionment is not based on historical use, it will vary from such

73

use. However, the charts do not account for the farm unit sharing and clearinghouse contained in the 2013 EDP.[45]

We conclude that the District abused its discretion only as to its user prioritization. In all other respects, the District acted within its discretion in adopting the 2013 EDP, and the superior court erred in concluding otherwise.

D.     *Declaratory relief*

The District contends that the superior court erred by granting declaratory relief that, among other things, requires that the District use a historical method for apportioning water. We agree.

    1.     *Additional background*

Abatti sought a declaration that the District had no authority to adopt or implement the 2013 EDP, or any other water distribution plan that "treats agricultural water users unfairly, inequitably and in violation of the [District's] statutory and fiduciary duties to its beneficiaries and their water rights." He alleged that an actual controversy exists as to whether the District had the authority to adopt the 2013 EDP. He further alleged that the 2013 EDP does not equitably distribute water because it prioritizes other users over farmers, and because it treats all farmland as requiring the same amount of water.

---

[45]     Abatti additionally contends that farmers "cannot reasonably be subjected" to the uncertainty of straight line apportionment, arguing that the "Legislature recognized as much in enacting sections 22252.1 and 22252.3 . . . ." We rejected Abatti's interpretation of these sections *ante,* and he provides no support for this further assertion.

In the statement of decision, the superior court declared that the District "lack[ed] authority to further implement the 2013 EDP," or to adopt any other plan that prioritizes "certain classes of water users, other than domestic, ahead of farmers." The court stated:

> "[A]ny apportionment of water among farmers must not use a straight-line apportionment method or hybrid method incorporating a straight-line component, which is not equitable. . . . [A]n equitable apportionment of water must take into consideration factors including the area to be irrigated, the character of the soil, the crops to be grown, and the practicability of irrigation. Therefore, the court declares that historical use, which reflects these factors, is the equitable and acceptable means of apportionment."

Finally, the court declared that the District is "not empowered" to enter into new contracts with non-domestic or non-agricultural users that would guarantee water during shortages, in a manner inconsistent with the court's findings. The court entered a declaratory judgment consistent with these findings.

2.      *Applicable law*

Under Code of Civil Procedure section 1060, declaratory relief "is available 'in cases of actual controversy relating to the legal rights and duties of the respective parties.' " (*Coronado Cays Homeowners Assn. v. City of Coronado* (2011) 193 Cal.App.4th 602, 607). "If an actual controversy exists, it is within the trial court's discretion to grant or deny declaratory relief." (*Gilb v. Chiang* (2010) 186 Cal.App.4th 444, 458.) However, the power to grant declaratory relief " 'does not purport to confer upon courts the authority to control administrative discretion.' " (*Zetterberg v. State Dept. of Public Health* (1974) 43 Cal.App.3d 657, 664; see *Bautista v. State of California* (2011) 201 Cal.App.4th 716, 733-734 (*Bautista*) ["[d]eclaratory relief . . . does not confer

75

upon the court the authority to make pronouncements in a field reserved to other branches of government"].)

We review the decision to grant or deny declaratory relief for an abuse of discretion. (*Osseous Technologies of America, Inc. v. DiscoveryOrtho Partners LLC* (2010) 191 Cal.App.4th 357, 364.) We review underlying factual findings for substantial evidence, and apply de novo review to legal issues. (*City of Oakland v. Oakland Police & Fire Retirement System* (2014) 224 Cal.App.4th 210, 226.)[46]

3.     *The superior court erred in its grant of declaratory relief*

The District first contends that the superior court usurped its authority in declaring that historical apportionment is the only reasonable method of apportionment. We agree. Abatti sought a declaration that the District lacks authority to adopt the 2013 EDP or any other plan that treats farmers inequitably. Even if the District acted inequitably and abused its discretion in adopting the 2013 EDP, the superior court did not simply declare that the plan is inequitable and that the District lacks authority to adopt it. Instead, the court went beyond the relief requested, requiring the District to prioritize users in a particular way, to use a particular apportionment method, and to refrain from entering

---

[46]     Declaratory relief can be "employed to determine the relative rights of all interested parties to a specified water source." (1 Slater, California Water Law and Policy (2006) Introduction, ch. 9, p. 9-2; see, e.g., *Tulare Irrigation Dist. v. Lindsay-Strathmore Irrigation Dist.* (1935) 3 Cal.2d 489, 533 (*Tulare*).) However, Abatti did not ask for a declaration of rights; instead, he assumed that the farmers possessed certain water rights that were superior to the rights of other water users, and based on those assumed rights, asked for relief as to the EDP. We addressed the issue of the farmers' rights *ante*, and focus here only on the EDP.

into certain contracts. The court thus directed the District's future exercise of discretion. In doing so, it erred. (See *Bautista*, *supra*, 201 Cal.App.4th at pp. 733-734 [rejecting farmworkers' request for declaration that heat illness regulation was inadequate and order for state "to provide more protection to farmworkers" through its agencies]; *Cal. Optometric Assn. v. Lackner* (1976) 60 Cal.App.3d 500, 509 [declaratory judgment under statute allowing challenge to regulation validity was "infused with error" and abuse of discretion, where it was "not confined to a declaration of invalidity," but "essay[ed] control over the agency's future proceedings"]; *ibid*. [declaration also exceeded relief under Code Civ. Proc., § 1060; it would "dictate a public agency's ongoing administration of statutory functions"].)

The view advanced by Abatti that the declaratory relief that the superior court ordered is proper, is not persuasive. Abatti contends that use consistent with local custom is reasonable, citing *Tulare*, and that "historical use of irrigation water gives rise to a presumption of necessary and beneficial use," citing *Joerger v. Pac. Gas & Elec. Co.* (1929) 207 Cal. 8, 23. Even if prior use were always reasonable—and the cases that Abatti cites do not stand for this principle—that would not would justify requiring the District to use historical apportionment rather than another method. (See *Tulare*, *supra*, 3 Cal.2d at pp. 547, 567 [appropriator can make reasonable use of water "according to the general custom," but elsewhere noting that a beneficial use "may, because of changed conditions, become a waste of water at a later time"]; *Joerger*, at pp. 22-23 [noting presumption of necessary and beneficial use "[i]n passing"].) Abatti also contends that the court properly concluded that equitable apportionment must consider various factors

77

reflected by historical use. The court's conclusions lack support, as discussed above, and do not suffice to bar other methods.

Second, the District contends that the superior court's declaratory relief violates the state constitution, because requiring historical apportionment is contrary to reasonable use. The reasonableness of historical apportionment is not properly before us: the 2013 EDP permits, but does not require, historical apportionment, and we have already concluded that the superior court erred in finding that this method is the only reasonable one and granting declaratory relief requiring its use. However, we shall still address the parties' arguments.

The District contends that under the superior court's historical apportionment method, users with high past use "will be apportioned the most water, while those who have conserved . . . will be apportioned less," and there would be no incentive to conserve. These concerns are well-founded.[47]

Abatti suggests that the District is arguing that taking farmers' needs into consideration encourages waste, and contends that the District has not identified evidence that farmers "engaged in any unreasonable use of water in 2013" that justifies limiting their water rights or the amounts of water that they will receive from the District. The District is arguing against a historical method that could impede conservation; it is not

---

[47]     We reject any inference that historical apportionment is necessarily problematic. Just as the District used a default straight line method and other components, and was able to address conservation and user needs, a different apportionment plan could conceivably be based on the historical method and satisfy similar objectives.

78

advocating that farmers' needs be ignored. Further, the District has the authority to modify service by way of an apportionment plan regardless of whether farmers' past use was unreasonable.

Abatti offers various arguments in support of the superior court's historical apportionment method, which are not persuasive and would not justify its mandatory use, in any event.

First, Abatti contends that farmers have become more efficient since the QSA, citing a 2012 report on water transfers that shows conservation from fallowing and efficiency-based measures. Given the overruns, the District could have reasonably concluded that water management beyond these programs was needed. Abatti further contends that he has a "reasonable and beneficial need" for more water than the hybrid method would allocate and that he would suffer even more under straight line apportionment, citing declarations that he filed in the superior court. However, the declarations minimize Abatti's ability to obtain water from the clearinghouse, claiming that "there is no guarantee" that he could. Further, the declarations reflect that Abatti has not actually been denied water.[48]

Second, Abatti relies on an early discussion paper prepared by Hanemann and Brooks to argue that the experts "originally agreed" that historical allocation "more accurately reflect[ed] differences in farmers' water needs"; that it should require minimal

---

[48] Abatti represented that the reason he has not been denied water was because of the on-going litigation and other factors.

cost, given the District's data; and that straight line apportionment could be viewed as unfair. This description is incomplete at best, and regardless, the District could reasonably rely on the experts' report rather than on an earlier discussion paper.[49] Abatti also maintains that the District possesses the data necessary for a historical approach. Both the experts and District counsel addressed the limits on the District's field-level data, at least prior to 2003.

Finally, Abatti contends that if an apportionment plan fails to recognize historical use, the "fundamental premise under which the QSA and the IOPP operate[] will be undermined," and that "[a]ny precedent . . . that water use history is irrelevant . . . would threaten future conserved water transfers" by Colorado River diverters. Abatti does not elaborate on the "fundamental premise" underlying the QSA and IOPP, but to the extent that he is referring to the historical agricultural basis for the District's Colorado River entitlement, we explained *ante* that the District's obligation to the farmers is to consider their rights in apportioning water—not to preserve the amounts that they have historically been apportioned without change. As for Abatti's fears about precedent, the District's objection to being forced to rely on historical use does not mean that it intends to ignore it. Indeed, the District included historical use as a possible apportionment method in the

---

[49]    The paper described the apportionment methods, but did not identify one as more accurate in reflecting users' water needs. It stated that straight line "may or may not be viewed as fair" and also noted that the historical method could be viewed as a "source of inequity." Abatti also notes that the experts' conclusions focused on shortage situations. The paper that Abatti cites preceded the experts' report, it addressed shortage situations as well as normal ones, and the report provides support for the 2013 EDP, notwithstanding its focus on shortage scenarios.

2013 EDP, and implemented a hybrid method that contained a historical component for calendar year 2014.[50]

E. *Breach of fiduciary duty and taking claims*

The superior court sustained the District's demurrer to Abatti's claims for breach of fiduciary duty and taking without compensation (taking). We conclude that the court properly sustained the demurrer.

1. *Additional background*

Abatti initially pursued claims for breach of fiduciary duty and taking, when the case was assigned to Judge Altamirano. The court sustained the District's demurrer to these claims in the first amended petition, with leave to amend. In Abatti's second amended petition, with respect to his breach of fiduciary duty claim, he alleged that the District "owes Abatti and other users a fiduciary duty of fair dealing, candor, care and loyalty" and that the District breached its fiduciary duties with the adoption of the 2013 EDP. He further alleged that "[a]s a proximate result of the [District's] actions in adopting and implementing" the 2013 EDP, he "has been damaged . . . ."

As for his taking claim, Abatti alleged that he and other owners hold "valuable appropriative water rights" and that "[r]eceiving water service from the [District] in an equitable manner is essential to preserving the value" of his real property and water

---

[50] Abatti contends that this purported precedent would impact water transfers "contemplated by the proposed Drought Contingency Plan for the Colorado River," for which he seeks judicial notice. Because we reject this argument, we have no need to take judicial notice.

rights. He further alleged that in adopting the 2013 EDP, the District "has taken and damaged such private property rights of Abatti and other similarly-situated agricultural property owners both through a physical taking of water and a regulatory taking of rights without compensation."

The District demurred again. At the hearing on the demurrer, the superior court expressed concern that there "might not be property rights that are being taken" and "may not be any damages." Abatti's counsel argued that there was "harm to . . . water rights" once the 2013 EDP was implemented, explaining that water could be "shunted at any time" to those without rights and "[t]hat is the nature of the harm." Abatti's counsel further argued that the 2013 EDP "eroded [Abatti's] property rights, [and] constitut[ed] a taking and a breach of fiduciary duty." Counsel then asked the court to "[a]ssume, hypothetically" that he had an appraiser who would say that the value of Abatti's real property has been reduced due to the uncertainty caused by the EDP, and contended that he "may or may not be able" to establish "that there is a proper element of damage, but the time to prove it . . . is at the trial . . . ."

Judge Altamirano sustained the demurrer. The court noted that there was "an allegation of the bare legal conclusion of damage, without the allegation of ultimate facts to back it up." The court concluded:

> "Although the court agrees that by virtue of past dealings, [Abatti has] a reasonable expectation of an allocation of water that is fair and equitable, the court disagrees with [Abatti's] claim that [he has] property rights in allocations of water on a specific basis such that [he] can claim damages for changes in such allocations, if such changes in fact occur. Because [the District] is funded on water rates, as opposed to assessments, if the allocation fluctuates

82

> downward, [Abatti is] relieved of the requirement of paying for water [he does] not receive, hence there is no 'taking' which would give rise to a claim for inverse condemnation damages."

The court denied leave to amend, explaining that "[l]eave to amend is generally favored," but noting that Abatti had "already amended twice" and that he had made "no showing as to how [he] could in good faith amend . . . to actually state a cause of action."

2. *Applicable law*

We review a ruling sustaining a demurrer de novo, exercising independent judgment as to whether the complaint states a cause of action as a matter of law. (*Desai v. Farmers Ins. Exchange* (1996) 47 Cal.App.4th 1110, 1115.) "We affirm the judgment if it is correct on any ground stated in the demurrer, regardless of the trial court's stated reasons." (*Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 111.) Further, " '[i]f another proper ground for sustaining the demurrer exists, this court will still affirm the demurrer[ ] . . . .' " (*Jocer Enterprises, Inc. v. Price* (2010) 183 Cal.App.4th 559, 566.)

When a demurrer is sustained without leave to amend, "we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 (*Blank*).)

83

3.    *Analysis*

a.    *Breach of fiduciary duty claim*

" 'The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach.' " (*Green Valley Landowners Assn. v. City of Vallejo* (2015) 241 Cal.App.4th 425, 441.) Where "damages are an element of a cause of action, the cause of action does not accrue until the damages have been sustained." (*City of Vista v. Robert Thomas Securities*, *Inc*. (2000) 84 Cal.App.4th 882, 886 (*City of Vista*).)

The superior court determined that Abatti failed to allege facts establishing damages that would support his claims. We construe this as a finding that Abatti did not sufficiently plead damages for purposes of his breach of fiduciary duty claim. Even assuming that the District had a fiduciary duty to Abatti and that the EDP somehow breached that duty, we conclude that Abatti's failure to adequately plead damages is a sufficient basis to sustain the demurrer.[51]

In his initial brief, Abatti contended that his pleading was adequate, because irrigation districts cannot violate vested property rights. He elsewhere cited, in support of both of his claims, allegations describing the farmers' purported property interests in water distributed by the District, asserting that the District "unlawfully takes water rights

---

[51]    Given the inadequacy of Abatti's allegations of damages or harm, we need not reach the superior court's theory that the nature of Abatti's rights forecloses damages, and thus need not address Abatti's objection that the District never raised his "lack of any property right" in its demurrer.

84

and water away" from farmers, and that the District had exacerbated the harm by implementing the 2013 EDP after Abatti had planted crops and "in many instances" financed them and crops for later that season. He also contended that his counsel "made a proffer as to diminution in value evidence" at the hearing, referencing his counsel's request to the superior court that it "[a]ssume, hypothetically" that he could provide such evidence. We are not persuaded. As we have determined, *ante*, Abatti possesses a right to service, and changes to service do not necessarily impede or diminish that right. Assuming that injuries from such changes could support a claim for damages, one would still have to sufficiently allege them. Abatti simply speculates that the 2013 EDP could harm farmers, if it were to operate based on his own assumptions (e.g., the clearinghouse would be ineffectual, etc.), and it appears his counsel assumed that he could show a diminution in value in connection with those assumptions. Even in alleging that the 2013 EDP has the effect of taking water from him, Abatti does not assert that he has *actually* been denied any water. Neither potential harms, nor counsel's hypothetical arguments, suffice to establish compensable damages. (*Blank*, *supra*, 39 Cal.3d at p. 318 [demurrer is treated as "admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law"]; *City of Vista*, *supra*, 84 Cal.App.4th at p. 886 [" 'Mere threat of future harm, not yet realized, is not enough.' "].)

On reply, Abatti contends that the breach of fiduciary duty cause of action "was properly alleged even if the specific nature and proof of [his] damages, such as the value of [his] water right, the diminution in the value of [his] real property due to a permanently reduced water right, and/or the losses to [his] farming business attributable

85

to a future diminished supply of water, remained for determination," citing *Allen*, *supra*, 101 Cal.App.2d at p. 467. We need not address points raised on reply. (*American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453 (*Stroh*) ["[p]oints raised for the first time in a reply brief will ordinarily not be considered, because such consideration would deprive the respondent of an opportunity to counter the argument"].) Even if we were to consider these arguments, we would not find them to be persuasive. The issue is not a lack of specificity in alleging damages; rather, it is the lack of any alleged damages at all. In describing potential harms, Abatti does not contend that he has in fact suffered those harms. As for *Allen,* the case is inapposite. (*Allen*, at pp. 467-468, 473-475 [affirming judgment voiding irrigation district lease that constituted breach of public trust; no analysis of pleadings or damages].)

Finally, the burden is on Abatti to articulate how he could amend his pleading to render it sufficient. (*Blank*, *supra*, 39 Cal.3d at p. 318; *Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349 ["Plaintiff must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading."].) Not only did Abatti fail to meet this burden, he forfeited the issue by not addressing amendment in his initial brief. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived."]; *Stroh*, *supra*, 10 Cal.App.4th at p. 1453.) Abatti's conclusory assertion on reply that he should be allowed to amend does not salvage the argument.

b. *Taking claim*

" 'The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property.' " (*Bottini v. City of San Diego* (2018) 27 Cal.App.5th 281, 307 (*Bottini*).) Government regulation may also "be so onerous that its effect is tantamount to a direct appropriation or ouster" and such "regulatory takings" may also be compensable. (*Ibid*. [" 'regulations that completely deprive an owner of "all economically beneficial us[e]" of her property' "].) There is also a "third 'essentially ad hoc' category of regulatory takings" under *Penn Central Transportation Company v. New York City* (1978) 438 U.S. 104, 124 (*Penn Central*). (*Bottini*, at pp. 307-308 [primary factors are economic impact, interference with investment-backed expectations, and character of the government action].)

The superior court determined that Abatti did not sufficiently allege a taking claim, reasoning that the District is funded from water rates, so if the "allocation fluctuate[d] downward," Abatti would be relieved of "paying for water [he does] not receive" and "there is no 'taking'. . . ." We agree that Abatti did not sufficiently allege a taking claim, but for reasons different from the superior court's.

In his initial brief, Abatti contended that he "specifically alleged a taking," citing his allegation that the 2013 EDP resulted in a taking of his property through both a physical and a regulatory taking. He also relied on his allegations and counsel's arguments as to property rights and potential harms, as he did for his claim of breach of

87

fiduciary duty. He then reiterated that he "sufficiently alleged all of the required elements of a taking," citing various cases.[52] These contentions lack merit.

First, Abatti's allegations that a taking occurred are entirely conclusory. As for his other allegations, we explained *ante* that Abatti's right entitles him to water service, and that he cannot allege harm based on a change to service, alone, or speculation about future harms. At best, Abatti's taking cause of action amounts to a claim that *if* the 2013 EDP were to cause injury to farmers by denying them water, *then* it would support a taking claim of some sort. This does not establish that a physical taking has occurred, or that any regulatory taking that might exist is ripe. (*Bottini*, *supra*, 27 Cal.App.5th at p. 307; see *York v. City of Los Angeles* (2019) 33 Cal.App.5th 1178, 1195 [owner bears " ' "heavy burden of showing that a regulation as applied to a particular parcel is ripe for a taking claim" ' "].) Abatti also offers no analysis or authority as to how a purported diminution in value would support a taking claim here.

Courts have rejected taking claims based on water use when they were premature or otherwise unfounded. (See *Casitas Municipal Water District v. United States* (Fed. Cir. 2013) 708 F.3d 1340, 1359 (*Casitas*) [physical taking claim based on right to beneficial use of water accrued not when agency issued opinion, but whenever diversion might occur]; *Allegretti*, *supra*, 138 Cal.App.4th at pp. 1267, 1271-1272 [county did not effect a physical taking by approving conditional use permit that limited aquifer

---

52    Abatti elsewhere cites section 22263, which provides that nothing in the Irrigation District Law authorizes diversion to an interest holder's detriment without compensation. Abatti provides no substantive argument about this section, and thus forfeits the point.

extraction, where county did not encroach or authorize encroachment on owner's land or aquifer, or divert water]; *id*. at pp. 1276, 1277 [owner also did not establish total regulatory taking or taking under *Penn Central*].)

The cases that Abatti cites illustrate that water rights can support a taking claim. However, that point is not in dispute. The cases do not establish that Abatti adequately pled such a claim. (See *Peabody v. City of Vallejo* (1935) 2 Cal.2d 351, 358-359, 374-375 [in action by riparian owners, acknowledging appropriator use that "causes substantial damage" to land with paramount right is "an impairment . . . for which compensation must be made," but remanding for consideration of reasonable use and other issues]; *Salton Bay Marina, Inc. v. Imperial Irr. Dist.* (1985) 172 Cal.App.3d 914, 937-938 (*Salton Bay*) [ordinance required owner to dedicate property "for flooding purposes" to obtain building permit; because "potentially all of a . . . property might have to be dedicated," the ordinance acted as a "subterfuge for a taking"]; *Klamath Irr. Dist. v. United States* (Fed. Cir. 2011) 635 F.3d 505, 509, 511, 517-18 [addressing federal cessation of water deliveries in 2001 to protect endangered species; remanding for determination of whether plaintiffs had property interests under applicable Oregon law and whether those rights were impaired]; *Baley v. United States* (2017) 134 Fed. Cl. 619, 668 [taking claim by landowner class in Klamath litigation; termination of water delivery

was analyzed as physical taking].)[53]  If anything, the cases underscore the inadequacy of Abatti's allegations.  For example, in the Klamath litigation, the government actually withheld water deliveries.  Trial testimony reflected that a subsequent "late release of water was of very little, or more often, no use," and that some plaintiffs "never received any of this water."  (*Baley*, at p. 640.)

On reply, Abatti attempts to show that his taking claim is not speculative.  Even if we were to address these belated arguments, we would reject them.

Abatti first cites the allegation in his petition that receiving equitable water service is essential to preserving the "value of [his] property rights."  He also cites allegations from his petition that, under the 2013 EDP, he could lose up to 50 percent of the water that he needs, and his business activities would be severely hampered as a result.  These allegations are inadequate for the same reasons as those he discussed in his initial brief; they are speculative, rest on unfounded assumptions regarding the EDP's operation, and reference a value diminution theory for which he provides no substantive analysis.  Second, in response to the District's contention that Abatti's claims are speculative, Abatti argues that if he had filed suit after water delivery had been curtailed, the District would have argued that his claim accrued in October 2013, when the 2013 EDP was adopted, citing *Davies v. Krasna* (1975) 14 Cal.3d 502, 515.  We decline to entertain such conjecture.  *Davies* is not a taking case, but rather, confirms that harm is necessary for a

_____

[53]     Abatti also cites a case outside the water context, *Kissinger v. City of Los Angeles* (1958) 161 Cal.App.2d 454.  Similar to *Salton Bay*, it involved a zoning ordinance that was basically a subterfuge for a taking.  (See *id*. at pp. 460, 462-463.)

90

claim of breach of fiduciary duty to accrue, and, as noted, Abatti is merely assuming that water will become unavailable at some future time. (*Davies*, at p. 514; see *Casitas*, *supra*, 708 F.3d at p. 1360 [a "physical taking . . . may never occur"].)

Abatti cites additional cases on reply, but those cases involve actual diversions of water or cessation of water delivery, or are otherwise inapposite. (See *Los Angeles v. Aitken* (1935) 10 Cal.App.2d 460, 466-472, 475 [affirming damages for riparian and littoral owners after city condemned and diverted recreational waters in manner that would reduce water levels]; *U.S. v. Gerlach Live Stock Co.* (1950) 339 U.S. 725, 729-730, 752-753 [upholding compensation to riparian owners who depended on river overflow, after construction of Friant Dam ended overflow]; *Dugan v. Rank* (1963) 372 U.S. 609, 613, 625-626 [downstream water rights holders challenged upstream impounding from Friant Dam construction; if available, remedy would be damages based on market value before and after taking]; *Tulare Lake Basin Water Storage Dist. v. U.S.* (2001) 49 Fed. Cl. 313, 314-315, 318-320 [projects with government contracts for water

established physical takings based on pumping restrictions to protect fish habitats that resulted in water being unavailable].)[54]

Finally, as with his breach of fiduciary duty claim, Abatti had the burden to show how he could amend his petition to state a taking claim, but failed to address the issue in his opening brief, and has thus forfeited it. The arguments that he raises in reply are not persuasive. Abatti contends that he is entitled to amend "to state more detailed allegations that the amount of water allocated to [his] lands under the EDP" is less than what he requires and "to allege diminution in value of [his] lands as a result." Even if Abatti were to amend as he suggests, he would still fail to allege any actual denial of water, and he cites no evidence or authority to establish that the value of his land has been diminished as a result of the adoption of the EDP, or that even if there were a diminution of value, that this would establish a taking in these circumstances.[55]

---

[54] Abatti cites two additional sources. In his initial brief, he seeks judicial notice of a comment made by a Board member at a 2018 hearing that an appurtenant right to use water cannot be taken without compensation. On reply, he contends that the District argued in *Bryant* that imposing the federal acreage cap would have "taken the landowners' water rights" and addressed the value of the lost right. We decline to take judicial notice of the Board member's comment; the sufficiency of Abatti's pleadings is a question of law, and this does not advance that inquiry. Although we need not consider the belated contention about the District's argument in *Bryant*, we point out that *Bryant* did not involve a taking claim.

[55] Our conclusions here are limited to the taking claim brought by Abatti. We take no position as to claims that a user might bring in the future.

F.    *District challenges to Abatti's petition*

The superior court rejected the District's arguments that Abatti's lawsuit is barred by the statute of limitations and by a prior validation action.  The District has not established that these rulings are in error.

1.    *Additional background*

In addition to challenging Abatti's breach of fiduciary duty and taking claims, the District demurred to his first amended petition on the grounds that the petition challenged provisions that were contained in previous EDPs and were thus barred by the statute of limitations (Code Civ. Proc., § 338), and that Abatti's claims were also barred by the *Morgan v. Imperial Irrigation District* (2014) 223 Cal.App.4th 892 (*Morgan*) validation action.[56]  Judge Altamirano overruled the demurrer, but indicated that she had questions. The District subsequently filed a motion to strike the second amended petition on similar grounds, and specifically sought to strike allegations regarding EDP provisions that had been contained in previous EDPs (i.e., allocation of water to non-agricultural users before farmers, the default straight line apportionment, and the formation of a clearinghouse).

In the same order in which Judge Altamirano sustained the District's demurrer as to the taking and breach of fiduciary duty claims in the second amended petition, she

---

[56]    As we explain *post*, a government agency can bring a validation action to confirm the validity of certain of its actions, and a judgment in the agency's favor bars future challenges; a person or entity can also file a reverse validation action to challenge government action.  (Code Civ. Proc., § 860 et seq.)  *Morgan* was a reverse validation action in which water users contested a rate change and fees in the 2008 EDP.  The District believes that *Morgan* bars challenges to provisions of the 2013 EDP that existed at the time.  (*Morgan*, *supra*, 223 Cal.App.4th at pp. 897, 903, fn. 4, 925.)

93

granted the motion to strike, in part. In the demurrer section of the order, the court ruled that a party aggrieved by an EDP is required to file a reverse validation action within 60 days (i.e., of the challenged government action), and that Abatti could therefore challenge only the October 2013 EDP "with respect to any change . . . from the May 2013 EDP, as to which, along with all prior [EDPs], attack is barred by the passage of time." Addressing the motion to strike, the court first indicated that "references to the earlier [EDPs] intended to in any [way] attack their current vitality, are barred." Pertinent here, and notwithstanding the preceding rulings, the court denied the motion to strike as to certain allegations in Abatti's petition that addressed provisions in the 2013 EDP that were contained in previous EDPs.

In November 2014, Abatti filed the operative third amended petition, which retained these allegations. The District filed another motion to strike addressing the statute of limitations under Code of Civil Procedure section 338 and *Morgan*, which Abatti opposed. The case was reassigned to Judge Anderholt in December 2014. Judge Anderholt heard and denied the motion to strike. In denying the motion, the court noted that Judge Altamirano's order was "very specific . . . . [p]arts of these paragraphs are in; parts of these paragraphs are out." The court also asked the District's counsel whether these were issues that the District could raise at trial, and counsel indicated that it could. The District addressed the statute of limitations and *Morgan* in its brief opposing Abatti's petition.

In its Statement of Decision, the superior court ruled that Abatti's action was timely. The court explained that "the 2013 EDP was not merely piecemeal revisions . . . ,

94

and was adopted . . . as a new, complete, fully integrated plan which did not require resort to older plans for interpretation." The court further explained that the 2013 EDP "contained substantial changes" from prior EDPs, including changes to the plan definitions and provisions impacting farmers. The court also found that *Morgan* did not bar Abatti's claims, explaining in part that the challenges to the prior EDPs in that action "had been dismissed and therefore [were] not adjudicated in that case," and that the 2013 EDP "did not exist at the time of resolution of the [*Morgan*] case."[57]

2.      *Analysis*

a.      *The superior court did not exceed its authority*

As an initial matter, the District contends that Judge Anderholt exceeded his authority by essentially "overruling a different judge's interim ruling in the same case." We disagree. Although the District's pleading challenges were based on the statute of limitations under Code of Civil Procedure section 338 and the *Morgan* validation action, Judge Altamirano's rulings were based on a different ground, i.e., her view that the statute of limitations for reverse validation actions limited Abatti to challenging the October 2013 EDP. Further, in her ruling on the District's motion to strike, she declined to strike certain allegations regarding existing EDP features—implying that she did not view the

_____

57      As part of his cross-appeal, Abatti challenged Judge Altamirano's ruling to the extent that it limited his ability to challenge aspects of the 2013 EDP that had also been included in the April and May 2013 versions of the EDP. The District viewed the issue as moot, given that Judge Anderholt had ruled that Abatti could challenge all aspects of the 2013 EDP, and Abatti agreed in reply that his challenge to that portion of Judge Altamirano's ruling might be moot. We need not address the issue further.

95

reverse validation issue as a total bar to consideration of such features. After the case was reassigned to Judge Anderholt, the District filed another motion to strike based on the statute of limitations under Code of Civil Procedure section 338 and *Morgan*— grounds that Judge Altamirano had not ruled on. The District agreed at the hearing that the statute of limitation and *Morgan* issues could be addressed at trial, and it raised them in its trial brief. Thus, Judge Anderholt properly addressed these issues in the court's Statement of Decision.

### b. *Statute of limitations*

"The general rule is that a cause of action accrues ' "when, under the substantive law, the wrongful act is done," or the wrongful result occurs, and the consequent "liability arises." ' " (*Arcadia Dev. Co. v. City of Morgan Hill* (2008) 169 Cal.App.4th 253, 262 (*Arcadia*).) Whether an act related to a prior act is separately actionable is "best analyzed by determining whether there is a factual basis for distinguishing" between them. (*Ibid*; *id*. at pp. 261-262 [addressing whether owner could challenge city's extension of a previously-adopted growth control ordinance].) Where, as here, "the underlying facts are not in dispute . . . , the question of when a cause of action accrues is a question of law, subject to independent review." (*Pacific Shores Property Owners Assn. v. Department of Fish & Wildlife* (2016) 244 Cal.App.4th 12, 34.)[58]

---

[58]   Abatti views the issue of whether the 2013 EDP is new as a disputed factual matter; even if that were so, it would not change our conclusion in his favor.

The superior court properly rejected the District's timeliness argument, because Abatti's challenge to the 2013 EDP accrued upon the adoption of the 2013 EDP. There is a significant basis to distinguish between the 2013 EDP and the prior EDPs even if the prior EDPs contained some of the same provisions as are contained in the 2013 EDP: the prior plans would apply only in shortage conditions, while the 2013 EDP was intended to be a permanent annual apportionment plan. There were other differences, as well, including changes to the agricultural allocation and new provisions to address overruns. Further, as the superior court observed, the 2013 EDP is a complete, independent plan that does not reference or depend on prior versions. (See *Arcadia*, *supra*, 169 Cal.App.4th at p. 265 [extension of growth control ordinance not intended to be permanent was "new burden" and could be challenged]; *Barratt American, Inc. v. City of Rancho Cucamonga* (2005) 37 Cal.4th 685, 703 [reenactment that extended duration of fee schedule supported cause of action; change was significant when considered with local agency's duties, and contrary result would render later reenactments immune to challenge].)

To establish that the 2013 EDP and those that preceded it are the same for purposes of its statute of limitations argument, the District relies on its description of the 2013 EDP and prior versions as "revisions," and notes that certain features contained in previous plans remain in place in the 2013 EDP. We are not persuaded. The issue is whether the 2013 EDP is different from previous plans. To the extent that pre-existing plan elements remain in place, they take on new significance as permanent, annual features in the 2013 EDP. As for the cases cited by the District, those cases involve

97

provisions not impacted by later enactments or are otherwise distinguishable. (See *Buena Park Motel Assn. v. City of Buena Park* (2003) 109 Cal.App.4th 302, 308 [plaintiffs could not challenge older hotel stay ordinance, or portions of related provision not altered by later ordinance]; *Napa Citizens for Honest Govt. v. Napa Cnty. Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 387, 390 [petitioners contended that traffic measures in specific plan invalidated circulation element of general plan; holding that attack on general plan was untimely].)[59] Finally, the District contends that permitting challenges to long-standing policies will "hamstr[ing]" its Board from making needed changes. Again, because the 2013 EDP marks a significant change, it is not insulated from challenge; permitting such challenge poses no threat to District's discretion.

c.      *Morgan validation action*

The validation statutes (Code Civ. Proc., § 860, et seq.) "provide a procedure by which a public agency may determine the validity of certain acts." (*Kaatz v. City of Seaside* (2006) 143 Cal.App.4th 13, 29.) A judgment in a validation proceeding is "binding and conclusive, as to all matters therein adjudicated or which at that time could have been adjudicated . . . ." (Code Civ. Proc., § 870.) If the agency does not timely file a validation proceeding, interested persons must bring what is called a "reverse validation action" to challenge the agency's action. (*Kaatz*, at p. 30 and fn. 16.) "The validation

_____

[59]     (See also *De Anza Properties X, Ltd. v. Cnty. of Santa Cruz* (9th Cir. 1991) 936 F.2d 1084, 1086 [physical taking claim based on elimination of sunset clause in rent control provision was untimely, because duration impacted only damages]; cf. *Arcadia*, *supra*, 169 Cal. App.4th at p. 266 and fn. 8 [distinguishing *De Anza*, as a taking is complete upon occupation, and noting doubt that it was "still viable law"].)

statutes do 'not specify the matters to which [they] appl[y]; rather, [their] procedures apply to "any matter which under any other law is authorized to be determined pursuant to this chapter." ([Code. Civ. Proc.,] § 860.)' " (*Id*. at p. 31.) Under the Irrigation District Law, matters subject to validation include the legality of an irrigation district and the validity of contracts with a duration of more than three years (and any federal contract), assessments, and bonds. (Wat. Code, §§ 22670, 23225, 23571, 50440.)

We agree with the superior court that *Morgan* did not result in a validation judgment that bars Abatti's action.

First, the EDP-related claims in *Morgan* were dismissed as moot. In that case, water users filed a reverse validation action contending that the District's passage of new water rates violated Proposition 218. (*Morgan*, *supra*, 223 Cal.App.4th at p. 897.) They also challenged certain fees contained in the 2008 EDP, which the District subsequently eliminated. (*Id*. at pp. 903, fn. 4, 925.) The superior court in the reverse validation action found that the rate-setting was proper. (*Id*. at pp. 903-904.) As for the EDP fees, the court found that the District "was discharging its obligation to establish equitable rules" for water distribution, but dismissed the EDP claims as "moot by stipulation" because the fees had been deleted and the parties stipulated that the EDP contained no property-related charge. (*Id*. at p. 927.) The court then awarded attorney fees based on the EDP claims. (*Id*. at p. 928) This court affirmed the merits ruling, but reversed the attorney fee award. (*Id*. at p. 930.) We determined that the superior court had mistakenly assumed that the EDP fees were improper, explaining that the fees had been deleted, the issue was not litigated, and the parties' stipulation did not imply that the fees would have been

99

improper if they had remained in effect. (*Ibid*.) We noted that nothing in the court's decision precluded the District from imposing a fee in the future, or customers from challenging it. (*Id*. at p. 931.) Second, *Morgan* could not have addressed, much less resolved, the validity of the permanent, annual provisions in the 2013 EDP, because they did not exist at the time that case was litigated. Because a validation judgment is binding only on matters that were specifically adjudicated or "which at that time could have been adjudicated" (Code Civ. Proc., § 870), *Morgan* does not bar Abatti's challenges to the 2013 EDP.

The District's position is not persuasive. It argues that the superior court in *Morgan* validated the EDP, this was not challenged on appeal, and the validation was thus binding and conclusive. Even assuming that an EDP is subject to a validation proceeding, which Abatti disputes, the District's argument fails to account for our holding in *Morgan*; our opinion in that matter makes clear that the superior court did not resolve the EDP claims on the merits. (*Morgan*, *supra*, 223 Cal.App.4th at p. 930.) Next, the authorities that the District cites involve matters encompassed by the prior litigation, which is not the case here. (See, e.g., *Colonies Partners, L.P. v. Superior Court* (2015) 239 Cal.App.4th 689, 694 [validity of settlement agreement was litigated in prior validation action]; *Eiskamp v. Pajaro Valley Water Mgmt. Agency* (2012) 203 Cal.App.4th 97, 100, 105-106 [challenge to 2002 ordinance increasing groundwater augmentation charges was barred by 2008 stipulated judgment that addressed similar ordinances and extinguished claims as to augmentation and management charges]; *Griffith v. Pajaro Valley Water Mgmt. Agency* (2013) 220 Cal.App.4th 586, 605,

100

disapproved on other grounds by *City of San Buenaventura v. United Water Conservation Dist.* (2017) 3 Cal.5th 1191, 1209, fn. 6 [same claim as in *Eiskamp*; although ordinance "was not technically under attack" at time of stipulated judgment, case was validation proceeding that extinguished potential claims].)

Finally, the District argues that "[t]he validating statutes should be construed so as to uphold their purpose, i.e., the acting agency's need to settle promptly all questions about the validity of its action," citing *Friedland v. City of Long Beach* (1998) 62 Cal.App.4th 835, 842. The purpose of validation is not in dispute; validation judgments nevertheless are binding only on "matters . . . adjudicated or which at that time could have been adjudicated . . . ." (Code Civ. Proc., § 870.) *Morgan* does not satisfy those requirements with respect to Abatti's action.

G.      *Abatti's challenges to the District's appeal*

Abatti argues that both collateral and judicial estoppel preclude the District from relitigating the farmers' rights, and that the District's appeal is moot. We disagree.

1.      *The District's contentions regarding the nature of farmers' rights is not barred by collateral or judicial estoppel*

"Collateral estoppel precludes relitigation of issues argued and decided in prior proceedings." (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341, citation omitted.) The doctrine's requirements are as follows: "First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former

101

proceeding must be final and on the merits.  Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding."  (*Id*. at p. 341.)

Abatti argues that the "issue of Farmers' water rights in the water held in trust by [the District] is identical" to the issue in *Bryant*, and "was actually litigated and necessarily decided" there.  The issues are not identical.  *Bryant* addressed whether a federal law could prevent the District from distributing water to irrigating landowners with more than 160 acres, and in doing so, discussed the nature of the landowners' rights.  (*Bryant*, *supra*, 447 U.S. at p. 356.)  This case addresses whether the District abused its discretion in adopting an equitable distribution plan for all users, including irrigating landowners.  *Bryant* aids our analysis, but does not resolve the inquiry.  (See *Johnson v. GlaxoSmithKline, Inc.* (2008) 166 Cal.App.4th 1497, 1513 [when " 'previous decision

rests on "different factual and legal foundation" [from] the issue . . . in the case at bar, collateral estoppel effect should be denied' "].)[60]

The judicial estoppel doctrine applies when:  " '(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake.' " (*Aguilar v. Lerner* (2004) 32 Cal.4th 974, 986-987.)

Abatti contends that the District is judicially estopped from arguing that the farmers "do not have a constitutionally protected interest" in the District's water rights. He relies on the District's submissions in *Bryant*, where it argued, among other things, that irrigating landowners possess an appurtenant, constitutionally protected property interest in the District's water rights and that "each individual landowner has a statutory

---

[60]    It does not appear that Abatti raised collateral estoppel in the superior court; although this could be a basis for forfeiture (*Rodgers v. Sargent Controls & Aerospace* (2006) 136 Cal.App.4th 82, 89), we elect to address it.  He raises additional, related arguments on appeal, as well.  Specifically, Abatti contends that *Bryant* bars relitigation under stare decisis, which we reject for reasons similar to our reasons for rejecting his collateral estoppel argument.  He makes a validation argument, based on a superior court opinion validating the 1932 Contract between the District and the United States, for which he seeks judicial notice.  The portion of the case that Abatti cites addresses the Reclamation Act.  Abatti has not established that it is a binding, validation judgment as to the issues before us, and we therefore decline to take judicial notice of the opinion.  Last, Abatti also contends on reply that the District raised different arguments regarding water rights in the superior court, and thus forfeited the arguments that it raises on appeal.  We do not consider this belated, cumulative argument.

103

right to a definite proportion of the District's water." The superior court did not address this argument when Abatti made it below, and we reject it.

First, Abatti does not demonstrate that the District has taken entirely inconsistent positions. (See *Bell v. Wells Fargo Bank* (1998) 62 Cal.App.4th 1382, 1387-1388 ["The party must have taken positions that are so irreconcilable that . . . 'one necessarily excludes the other' "].) It is not unreasonable, much less irreconcilable, that the District emphasized landowners' rights in *Bryant*, but underscores its own discretion and authority here; in both instances, the District was defending its authority to distribute water. To the extent that the District argued for individual entitlement to a specific proportion of water, *Bryant* appears to have rejected that contention. (*Bryant*, *supra*, 447 U.S. at p. 371 ["[i]t may be true . . . that no individual farm . . . has a permanent right to any specific proportion of the water"].) Second, even if the elements of judicial estoppel were satisfied, "[j]udicial estoppel is an extraordinary remedy that should be applied with caution." (*Kelsey v. Waste Management of Alameda County* (1999) 76 Cal.App.4th 590, 598.) We see no basis for its application here.

2.    *The District's appeal is not moot*

Finally, Abatti contends that the District's appeal is moot because the District has repealed the 2013 EDP. We disagree.

Waiver of the right to appeal may occur when there is "voluntary compliance" with a judgment. (*Lee v. Brown* (1976) 18 Cal.3d 110, 115.) However, "where compliance arises [only] under compulsion of risk or forfeiture, a waiver will not be implied." (*Id*. at p. 116; *see Cunningham v. Magidow* (2013) 219 Cal.App.4th 298, 302

[appeal was not moot; respondent cited "no authority" that "to preserve her right to appeal, [appellant] was required to defy the court's order"].) The District contends that it repealed the 2013 EDP because of the "threat of contempt," and the record supports that explanation.[61]

The superior court's writ of mandate required the District to withdraw the 2013 EDP. The District asked the superior court to recognize that the automatic stay under Code of Civil Procedure section 916 applied pending its appeal; Abatti contended that the stay did not apply. The superior court concluded that it did not have discretion to provide the relief sought by either party in light of the appeal. The District then filed a petition for writ of supersedeas in this court to confirm that the stay applied, while Abatti filed a petition for writ of mandate to confirm that it did not. On January 31, 2018, we denied the District's petition, concluding that the automatic stay did not apply. Meanwhile, Abatti had objected to the District's actions in approving a geothermal contract and advising farmers that it would continue implementing the 2013 EDP as disobeying the superior court's rulings. On February 8, 2018, the District repealed the 2013 EDP. These events support the District's explanation for the repeal, and reflect that in repealing the 2013 EDP, it was merely complying with the judgment pending its appeal. *Sierra Club. v. Bd. of Supervisors* (1981) 126 Cal.App.3d 698, cited by Abatti, is inapposite. (See *id*.

---

61     We take judicial notice of the District's repeal of the 2013 EDP, the parties' petitions to this court regarding a stay, and our order. (Evid. Code, § 452; *In re R.V.* (2009) 171 Cal.App.4th 239, 245, fn. 1 [taking judicial notice of materials potentially relevant to mootness].)

at pp. 704-705 [appeal concerning allegedly inconsistent zoning ordinance was mooted by adoption of general plan that eliminated the inconsistency].)

## DISPOSITION

The judgment is affirmed as to the superior court's ruling that the District abused its discretion in how it prioritizes apportionment among categories of water users in the 2013 EDP, and as to its dismissal of the breach of fiduciary duty and taking claims.

The judgment is otherwise reversed, and the superior court is directed to enter a new and different judgment:  (1) granting the petition on the sole ground that the District's failure to provide for equitable apportionment among categories of water users constitutes an abuse of discretion; and (2) denying the petition on all other grounds, including as to declaratory relief.

The parties shall bear their own costs on appeal.


AARON, J.

WE CONCUR:


BENKE, Acting P. J.


IRION, J.

106